THOMAS *v.* THE STATE OF GEORGIA.

1. The evidence authorized a conviction of murder.
2. Certain parts of the charge complained of, taken in connection with the whole charge, contain no such error as to require a new trial.
3. It is not error for the court, instead of charging as requested by defendant that if the jury have any reasonable doubts as to whether or not the confessions were voluntarily made, they must reject them, to charge that the jury are honestly to conclude, under the evidence, whether the confessions were freely and fairly made, and if they were, to take them into consideration, if not, to reject them from consideration.
4. An exception to the entire charge will not be considered if any of the charge be legal.
5. If testimony as to a confession be *prima facie* admissible, the court may leave to the jury to determine whether or not such confession was freely and voluntarily made.

March 10, 1890.

Murder. Criminal law. Verdict. Evidence. Charge of court. Confessions. Practice. Before Judge JOHN T. CLARKE. Early superior court. Special term, May, 1889.

The evidence for the State tended to show that, on the day and in the county charged in the indictment, the dead body of Susan Thomas, wife of the defendant, was found in what was known as the Wade branch, about a hundred yards from his house, and tracks of two persons, apparently man and woman, were found leading from his house to the branch. Previously on

the same morning, before sunrise, the defendant came to the house of Isabella McCoy, which was across the branch from his house, and his feet and legs were wet. She asked him how he came to be so wet, and he said he got wet in the branch where he promised to get a foot-log last year for old man Gilbert. Eight days before this, the defendant, speaking to Isabella of his wife, said, " The nigger I got aint fitten for nothing. She can't sew, she can't cut, she aint fitten for nothing but to eat." The water in the branch where the body was found was a little over a foot deep. Deceased was somewhat stout, weighing 130 or 135 pounds. According to one of the State's witnesses, she was strong and healthy ; according to another, she looked like a stout woman but was not strong physically. There were no signs of a scuffle or anything of that kind near where she was found. According to one witness, there was nothing to indicate any violence on her person, unless it was that a part of her hair was unwrapped and a part wrapped ; according to another, the only signs of violence found on her person were four or five, one on the cheeks, one on the ear and one on each side of the throat as if grasped by the hand. If there were any bruises about the throat to indicate choking, it was very slight. If there had been any such violence, it would have been indicated under the skin. She came to her death by drowning ; her stomach and lungs were found full of water by the physician who performed the autopsy. If she had been killed in any other way, that would not have been their condition. When found, her head was down stream, and one hand and perhaps both across her chest, the body being somewhat upon the side, in no condition to trouble her about getting up. The water was not deep enough to cover her body where she was lying but was deeper in the centre of the branch, the body being five or eight feet from the

deepest part. There was a foot-log about eight inches thick across the branch, the bottom of it touching the water. If she had fallen in the branch from swimming in the head or vertigo, she could easily have recovered before drowning. If she had been attacked with apoplexy so as to fall, she would not have swallowed water. There are many diseases of the brain that cause persons to drop off suddenly. If one were attacked with a nervous disease, or sudden rushes of blood to the head, or some other diseases, and were to fall into the water while breathing, they would draw water into the stomach and lungs. About three months before the drowning, defendant and his wife were playing and he laughingly said, "If you don't let me alone and quit fooling with me so much, I shall take you to the branch and drown you." After defendant was arrested, the sheriff talked with him a little, and as the officer was about to go, defendant told him to hold on, that he wanted to talk with him. The sheriff told him to wait until the next morning. The next morning, the sheriff got Gay, deputy-marshal, to go and feed the prisoner for him, and Gay afterwards told him defendant had confessed drowning his wife. Several went down to the jail, and defendant said it was probable that he had killed his wife and he had as well acknowledge it; that she wanted to follow him to town and he did not want her to go, and he slapped her off the foot-log at the Wade branch three times; that the first time she climbed back, and the third time he doubled up his fist, knocked her off and left her lying in the water and did not look back at all. The sheriff did not tell him that if he confessed he would not be hung, but if he did not he would be, nor did he hear any one tell him that it would be better for him to confess.

For the defendant, a witness testified that on the day after inquest, he heard Gay tell defendant that they had

found out on him and that he had to meet his God. A physician testified that there are some characters of diseases which would render a person insensible, but they would continue to breathe, and if they were to fall into the water when thus attacked, would drown; that a woman's hair is usually very thick, and a blow on her head might produce concussion, and she might drown by strangulation before she recovered, and there would not be much sign of a blow; that the lick would not make as much show under the skin of a negro as it would on a white person, and there would not be much show if she were hit with the fist; that the fist is not an instrument likely to kill under ordinary circumstances, and killing in such a way is very rare; that if deceased died from epilepsy or any sudden stroke of that kind, there would have been no external signs of violence, unless she struck something in falling; that if while standing on the foot-log, she was struck in the face, or on the head so as to produce concussion, she might not be able to recover and get out, and in such a case death would be a secondary effect from blows; that if a person were knocked into the water by the fist, it would be a weapon likely to produce death, provided the concussion was of such intensity as to prevent their recovery; that water in cold weather is a pretty good arouser, would arouse in hysteria more than in concussion of the brain, and would be of some value in that way; that it would be owing to the force of the fall, where the person fell or was knocked into the water a foot deep, whether the pebbly bottom would account for the scratches on the face; that strangling in water of that depth would cause scratching of the face against the bottom; and if she had died of epilepsy, the rigor motion would have been strongly marked; her tongue would have been bitten and bruised.

The defendant stated that before he made any con-

fession, the sheriff and Gay both advised him to make it, telling him that if he pleaded guilty they would not hang him, and if he did not they would.   Gay told him they knew enough to hang him and he had better confess all he had done or they would hang him, and said, "Yes, you are bound to hang and you had better prepare to meet your God."   The sheriff said, "You had better explain something, and it will be better for you"; that is how defendant came to explain about slapping her off the log.   They told him to say something to save his life, and he explained that.   He did not know what else to say.   His wife was an afflicted woman; had fallen out of a wagon in the early part of the year, so she told him, and it ran over her.   She had been sick twice this year, and he got her medicine and doctored her.

In rebuttal, the sheriff testified that he did not use the means stated by the defendant to get him to confess, but told him all the time that whatever he said would be used against him.   "We all told him so.   He was warned when put in jail to make no confession."   Gay testified that he did tell defendant when he was put in jail that he had as well confess to killing his wife as he did, as to have told as much as he had; but did not tell him that it would benefit him to make the confession.

After verdict, the defendant moved for a new trial on the grounds that the verdict was contrary to law and evidence, and on the grounds stated in the decision. The ninth ground was for error in the charge as a whole, because it had a tendency to exclude from the jury the theory of the defendant that he did not intend to kill his wife when he slapped and struck her, but merely intended to inflict such punishment upon her as would make her desist from following him and return to the house; and that when he and she went into the water, his leaving her at that time was to escape from any further contest and fight with her.

R. H. POWELL and HUGH HENDERSON, for plaintiff in error.

J. M. GRIGGS, solicitor-general, for the State.

SIMMONS, Justice.

Albert Thomas was indicted, tried and convicted of the murder of his wife. He made a motion for a new trial upon twelve grounds, which was overruled by the court, and he excepted. We deem it unnecessary to deal with these grounds *seriatim*.

1. In regard to the 1st and 2d grounds of the original motion, we think it is sufficient to say that we have carefully read and considered every word of the evidence sent up in this record, and we believe the evidence was sufficient to authorize the verdict of the jury.

2. The first six grounds of the amended motion complain of certain charges of the court, set out therein, as being erroneous. We do not think the charges complained of, when taken in connection with the whole charge, contain any such material error as would authorize us to grant a new trial in this case. The whole charge was a fair, full and able exposition of the law of murder, and presented the issues fairly to the jury.

3. The 7th ground of the amended motion complains that the court erred in refusing to charge, as requested by defendant, that if the jury had any reasonable doubts as to whether or not the confessions were voluntarily made, they must reject them. The 8th ground of the amended motion complains that in lieu of defendant's request to charge, the court gave the following: "Instead of that, I charge you, gentlemen of the jury, that you are honestly to conclude, under the evidence before you, whether these confessions were freely and fairly made. If they were, take them into your consideration; if not, reject them from your consideration." There was no error, in our opinion, in refusing to give

the charge as requested, and in giving instead the one set out in the 8th ground. This same point was made in the case of *Carr* v. *State*, decided at this term of the court, in which we held that there was no error in refusing to give the charge requested or in giving a charge in substance like the one in this case, and that the court was correct in leaving to the jury to determine, from the whole facts, whether the confessions were freely and voluntarily made. See that case and authorities there cited. 84 *Ga.* 250.

4. The 9th ground of the amended motion excepts to the entire charge of the court, and of course we cannot consider an exception of this kind.

5. The 10th ground of the amended motion complains that the court erred in not excluding from the jury the testimony of Black and Gay as to the confession. There was no error in allowing these witnesses to testify to a confession made by the defendant. *Prima facie*, the confession was admissible, and the court left it to the jury, under proper instructions, to determine whether the confession was freely and voluntarily made or not.                        *Judgment affirmed.*