Hill, J.
Albert Jackson, Son Strother, and Armstead Lawson were jointly indicted for the murder of Mrs. Jeffie Hartley. The indictment was returned by the grand jury of Peach County at the September term, 1930. It alleged that the homicide occurred on January 21, 1930, and that Mrs. Hartley came to her death by reason of wounds inflicted upon her by the defendants, who used a wooden bludgeon, wooden stick, and other instrument of like kind, the same being a weapon likely to produce death. Upon the call of the case for trial the defendants severed, and Albert Jackson was put upon his trial. The jury returned a verdict of guilty, without recommendation, and he was sentenced to suffer the penalty of death by electrocution. The defendant made a motion for new trial, which was overruled, and he excepted.
The primary question of fact in the case is as to the identity of the person or persons who committed the crime. There can be no question under the evidence that an outrageous murder was committed, and that the motive for the murder was robbery. It appears from the evidence in the case that on Thursday January 22, 1930, about 9 or 10 o’clock a. m., the bodies of Mr. and Mrs. Hartley were found in their little cabin home located in an isolated place *577 on or near the banks of Mnle Creek in Peach County. They were about eighty years old. When found Mr. Hartley was lying in front of the fireplace with two or three ugly wounds in his head which was crushed; and he had evidently been dead longer than Mrs. Hartley, because of the fact that his body and muscles were stiff and the blood which had flowed therefrom was coagulated. The body of Mrs. Hartley was found behind the door leading into the room where she was murdered. Her wounds were in the head also; the lower surfaces of both forearms were badly bruised as if in an effort to ward off the blows directed at her head. Her body was not as stiff as her husband’s, and her blood was only partially coagulated. The evidence and circumstances tended to indicate that the period of time at which the homicide was committed could not have been more than 24 hours, or at the outside 36 hours, before the dead bodies were discovered. There were live coals in the fireplace, and the fuel used to make the fire was partially dried pine wood obtained from limbs of pine saplings. Both Mr. and Mrs. Hartley when found were dressed, indicating that the murder occurred in the evening or early part of the night. Their chickens had been shut up in the chicken-house, and the door was fastened; their water-bucket was full, and the <enight glass” in the room where tlie old couple slept had not been used. A trunk in the room had been opened, and the contents of the tray had been scattered about the ^oom, partly upon the bed where the tray of the trunk had been placed. The bed itself had been disarranged, indicating that a search had been made of the springs of the bed and between the mattresses. Mrs. Hartley’s clothing was thrown over her head and her person was exposed. A string was found tied around her waist, a portion of which indicated that she had been wearing a little bag, or pouch, attached to this string next to her body. The bag, which corresponded to the string, was found on the floor of the room near the bed, ripped open and rifled of its contents. There was on the bureau an old-fashioned long-barrel pistol, and an old shotgun of the early make of breach-loading type was in the corner of the room. The weapons used to kill these old people evidently consisted of three sticks of the wood which was in the room for the purpose of making a fire. These sticks of wood were found near the bodies of the deceased, on which were blood-stains and hairs from the heads of the old couple.
*578 The testimony also showed that Albert Jackson, the defendant, lived about three miles from the scene of the homicide, and worked for a Mr. Jones. Several nights prior to the time of the homicide he stayed at the home of a negro woman who resided about a mile and a half from the scene of the homicide. The evidence disclosed that he was at this negro woman’s house on Tuesday night prior to the killing; that he stajred there only a few minutes, and while there held his head down and was not communicative. The next morning he was seen on the road between her house and where he lived. About a week after the homicide of Mrs. Hartley a pair of overalls with blood-stains on them was found in a clay root, or hollow stump, in the neighborhood of where the defendant lived. This stump, or clay root, was in the rear of a Mr. Braddock’s store. The defendant lived on or near the paved highway from Braddock’s store towards Macon. Mr. Jones, for whom the defendant worked, lived and operated a store below Braddock’s store towards Perry, Georgia. Braddock’s store is at the intersection of the paved highway between Macon and Perry, and a road that comes out from Powersville by way of Houser’s mill is used by, people who travel between Powersville and the highway in going to Macon or to Perry. The overalls, which were found in the clay root or stump, were wet and bloody, and had evidently been in the place where found for several days. The defendant was arrested for the the reason that he was the only person in that vicinity whom the overalls fitted. He denied that they were his, and stated that his overalls were at his home. The officer who arrested him went with him to his home and found a similar pair of overalls, also blood-stained. The defendant admitted that the overalls found in his home were his, and stated that the blood-stains on the overalls were caused by the defendant assisting in killing hogs a few days before that. He still denied any knowledge of the overalls found in the stump hole. The officer who made the arrest detected that there was similar patchwork on both pairs of overalls, and that the needlework in the patching in the two pairs of overalls was the same; and the defendant informed the officer that the patching had been done by a Mrs. Eobinson, and when the officer went to see Mrs. Eobinson he was informed by her that she had done all the patching on both pairs of overalls, and that both pairs belonged to the defendant, Albert Jackson. When the defendant was confronted with what Mrs. *579 Robinson had stated with reference to the patching on the overalls, he admitted that both were his, and endeavored to explain the concealment of one pair of overalls in the stump hole by saying that he had been over to see this colored woman he had been visiting, and that the overalls were wet with dew and he took them oil and put them in the stump hole to keep his employer, Mr. Jones, from knowing that he had been visiting the woman, because he said Mr. Jones had warned him to stay away from her, and had complained about his being late in getting to work in the morning, and he did not want Mr. Jones to know that he had walked from the woman’s house in the dews of the early morning. The defendant persisted in stating that the blood-stains came from the hog-killing.
The chief of police of the City of Macon, Mr. Watkins, cut out of the overalls found in the stump hole one or two large patches, or rather the patches were cut out by a doctor at the Macon hospital in his presence. These patches were cut out for the purpose of having the blood-stains on them analyzed, in order to determine if possible whether the blood was human blood. Chief Watkins took the two patches from the overalls to Atlanta and turned them over to Dr. George S. Klugh, whose laboratory is located on Forrest Avenue in the City of Atlanta. Dr. Klugh analyzed the blood, and he testified that the blood which stained these overalls was undoubtedly human blood. The officers found in the cuffs at the bottom of the overalls certain fine, long gray hairs. They also found similar hairs on the blood-stained pine sticks that were found at the scene of the homicide. The hairs that were taken from the overalls were “mounted on glass slides” and marked “overalls,” and in a similar way those taken from the pine sticks or clubs were mounted and marked “clubs.” Dr. Klugh testified that he examined these under a microscope; and his testimony was to the effect that both hairs, or sets of hairs, came from a human head. He said that it was barely possible that they came from different heads, but that the individuals who bore them must have been about the same age, in about the same condition as affects the general vitality, and that the same care of the hair had been taken, and must have been the same kind of hair to start with. The defendant was confronted with all of this evidence and these circumstances. E. B. Fagan, deputy sheriff of Peach County, and George D. Anderson, sheriff, both testified that the defendant made *580 a confession freely and voluntarily, which will be set out presently. They testified that the defendant was never promised anything for telling the truth about the case, or directly or indirectly threatened in any way. They both testified that they told the defendant that if he was guilty it would be better for him to admit it, but if he was not guilty he ought not to admit it, and that under no circumstances ought he to try to connect any one else with it who was not guilty. Several weeks after anybody had talked to the defendant he made what the State contends was a free and voluntary confession of guilt, and around this confession hinges one of the main questions in the case. With reference to this confession Mr. Fagan testified as follows:
“I got a letter from the defendant, but I don’t think I have the letter, and I got a message. I went up and called him, and he answered; and I asked him what he wanted me for, and he said ‘I want to confess; I can not sleep and can not rest,’ and I asked him if he wanted to go down stairs or stay up stairs, and he said ‘down stairs,’ and I handcuffed him and took him down stairs, and he was nervous. I got him down stairs and told him to sit down, and I called Mr. Williams over the telephone, and my wife and mother came before the defendant started to make any statement, and I told him not to come down ‘with a lie in your month,’ but to tell the truth. I told him he had just as well get right with the Lord, and he started off and said they planned this thing before Christmas, he and Son Strother, the first bad night they would go and do it, that he would come to Son’s house, he said Son told him Mr. Green Hartley had some money, and he left home that night and got' to Son’s house about 12 o’clock and hailed, and Son came to the door and came out, and they talked a little while, and Armstead Lawson was in the house and Son said Armstead was all right; and he said they went below Powersville and crossed through the woods and through the field, and he went above the house and Armstead went behind him by the chicken-house, and Son went to the door and says, Son knocked on the door and said, ‘Mr. Green, — and Mr. Green says, ‘Who is that?’ and Son says, ‘I have been across the creek to notify my son my boy is dead at Mr. Lee Thompson’s; and he says they stayed there about three minutes and he heard some one scream in the house, and Son says, ‘Come on, we have got them,’ and when he went in Son and Armstead *581 were standing behind the door with Mrs. Hartley, and they told him to grab her arms, and she said, ‘If you won’t kill me I will tell you where the money is; please don’t kill me, you have killed my husband,’ and he [defendant] says, ‘Don’t kill her,’ and Arm-stead, says, ‘Yes, kill her; she will tell it,’ and he said they hit her and her head fell side of his legs, and that was the reason the blood was on his overalls, and they got the money off of her and cut the sack open and threw the sack down and counted $400 of the money and three case half dollars, and he says, ‘Men, lets hurry away from here; it is getting late and I have got a long way to go.’ They left the house and come to the railroad, and all swore they wouldn’t know each other, and Son was to take the money and they were to meet the next following Thursday and divide it up, and he said he come along the railroad and he had on two pair of pants and he pulled off the bloody pair and laid them down and put the others on top of them, and he went the same way he came, and Son and Armstead went in the direction of the Diamond Fruit Farm coming towards Fort Yalley.”
Cross-examination: “This confession was made sometime in May. I don’t know the exact date, but about a couple of months after the crime. I think January 27th was when the crime was committed. I questioned the defendant when I first got him on two occasions, and after I put him in jail several times he would call me and ask me for a cigarette. I would say that I went to him about a dozen times when he didn’t call me. My mother and wife and Mr. Williams, and later Mr. Anderson, were present when the confession was made. I don’t remember telling him that it would be better to confess and I would try to get him a life sentence. I didn’t tell him that me and Mr. Garrett were like this [holding up fingers], and I didn’t tell him that I would see Judge Mathews, and he would not let him be executed, but I told him the best thing for him to do was to get right with the Lord and tell the truth, that if he was guilty the best thing to do was to tell the truth because the truth is the light. I didn’t tell him I would try to save'him. I just advised him to tell the truth. I didn’t promise him if he would confess I would get him a life sentence. I only advised him to tell the truth about it. The negro Anderson in jail is named Shorty Anderson, and he told me some things he heard. I did not engage him to get a confession, I told him anything he *582 could help me out on I would appreciate it, and that was after he called me to one side and said he had heard something. I didn’t put the defeñdant in the same cell with Shorty Anderson; they Avent all the way around; sometimes they got in the cells together and I didn’t know it; he might have been in the cell with Shorty Anderson, but they stayed mostly in the run-around. Mr. Williams and Mr. Anderson and my mother and wife and my little boy was present when he made the confession. I don’t believe I have ever heard anybody tell the defendant if he would confess they would try to see that it Avas light on him, but some might have said something along that line; I don’t remember; I know I have not. I don’t know AAdio might have said it, but there has been so much talk of this case it has been in the ears of so many people, and so many people have asked me so many questions about it. I have heard people tell him that if he was guilty the best thing to do AAras to confess so it would be light on him. I might have told him that myself. I says, f Jf you are guilty the best thing for you to do is to confess and get right with God.’ I told him I had known of the court being lighter when a man confessed, and that the court Avould be lighter on any of them if they told the truth. I told him in a lot of cases they are lighter if the prisoner confesses, but I didn’t promise him anything. I didn’t tell him I Avould use my influence with Solicitor Garrett if he Avould confess. I told him whenever people confessed the courts Avere lighter on them if they confessed and told the truth, but I wouldn’t advise anybody to confess if he was not guilty. . . I had tAvo letters from him, one on one day and one on the next; and I Avent to see him that night after everybody was asleep and it was after IS o’clock. I had not talked to him about the case that dajq I hadn’t said anything to him in four or five or six weeks- The letters came to me, but I hadn’t said anything to him.” At this point the court addressed the jury: “Gentlemen of the jury, in admitting the evidence of confession whether coming from this witness or subsequent witnesses, the court instructs you, in order to make a confession admissible it must have been freely and voluntarily made Avithout being induced by another by the slightest hope of benefit or the remotest fear of injury. The court is prima facie admitting this evidence to you for your consideration as evidence upon the confession; but you, after all, are the judges as to Avhether or not this testimony Avas freely and *583 voluntarily made, this confession by the defendant, without being induced by the slightest hope of benefit or the remotest fear of injury. If you find a confession was freely and voluntarily made, it will be considered by the jury with all the other evidence in determining the guilt or innocence of the defendant. If, in the opinion of the jury, you believe the confession was not freely and voluntarily made, you will not consider it at all.”
Witness: “I got his message and went up there about 12 o’clock and eased the door to see what was going on, and I found they were asleep; and I called him low, and he answered, and I asked him if he wanted to see me, and he said: ‘Yes, sir, I want to confess,’ and I said ‘Confess what?’ and he says, ‘Confess about the Hartley murder case. I feel bad, I can not sleep and I can not rest, and I want to tell the truth, we dont [done] it,’ and he asked me to take him to the kitchen, and I said all right and handcuffed him'and carried him down stairs, and it looked like he had an ague, sweat popping out of him, and I says, ‘Wait a minute, you tell the truth and nothing but the truth, because I have not got anything to promise you,’ and I called Mr. Williams and woke up my mother and wife and told him, if he wanted to confess, to tell the truth, but not to come down stairs with lies on his lips to try to put it on anybody else, and he started off and 'said: ‘Me and Son Strother planned it before Christmas, but the weather was not suitable; we planned to do it on a rainy night, so as to cover up all signs, and this night I left home and come to Lizzie Jackson’s house on the Smith place and stayed there a while, and then come to Son’s house and got there about 12 o’clock or a little later, and they had a small fire, and I hailed and he come to the door, and I says ‘It is Albert Jackson,’ and he says, ‘Have you come for business?’ and he says, ‘Yes,’ and they talked a little while and Son says, ‘We have got Armstead Lawson in the house and he is all right,’ and he says, ‘We went on down below Powersville and got on the railroad and crossed the trestle and went between the chicken-house and the mule-barn, and Son told me to go to the right of the house and Armstead to the left and I will call him out, and when I say come on boys everything will be ready. That was Son Strother telling Albert Jackson, and Armstead and Son called Mr. Hartley, and Mr. Hartley asked ‘Who is that?’ and Son says, ‘I am Son, and I am wet and want to come in and warm; I have *584 been to my son across the creek to tell him my son at Lee Thompson’s is dead/ and he heard chairs moving in there and in three or four minutes he heard a lady scream, and he says, 'Come on boys, I have got them/ and when he got in there they were beating Mrs. Hartley, and he caught her by the arm and they knocked her down and her head fell on his legs, and he said she told him if they wouldn’t kill her she would tell where the money was, and one of them says, 'Let’s kill her; she will tell/ and they cut the money off her body and there were three case half dollars in silver in the bunch when they cut the sack open and counted it. He told me the trunk was on the bed and the bed tore up and green wood on the left-hand side, and said he saw an old make of pistol; and I asked him why he didn’t get it, and he said he didn’t want it, and he said he saw it on an old bureau and a shotgun in the corner, and Mr. Hartley was lying in the front of the fireplace and Mrs. Hartley lying back of the door. I saw the shotgun in the corner and the pistol on the bureau. The tray of the trunk was sitting on the bed and the mattress turned up. The money sack was lying at the foot of the bed, cut open. He said he begged them to come on, that some one would catch them, that he had a long ways to go; and they come up the railroad and when they got to the railroad they swore they wouldn’t know each other or know anything, and they were to come back on Thursday and divide the money, and he come on up the railroad and pulled off his bloody pants and put the others over the bloody ones, that he had on two pair, and he cut through the woods and went back home, and after he left the sun was up, and he stopped and got him a cigarette and went on down by this negro house and went to Mr. Jones’, and after he got in the road he got to studying about the overalls, and he pulled them off and put them in the stump hole and went on and got there late, and Mr. Jones got after him about being late.”
From the testimony in the case we are of the opinion that the jury were authorized to find the defendant guilty.
Grounds 1 and 2 of the amendment to the motion for new trial assign error because the court overruled a motion to rule out all evidence with reference to the confessions alleged to have been made by the defendant. It is insisted by able counsel for plaintiff in error that these confessions were not freely and voluntarily made, but were obtained from the defendant by the hope of benefit *585 and the fear of injury. These grounds of the motion for new trial are as follows:
(1) “Because the court erred, during the trial of the case, in allowing the witness E. B. Eagan to give to the jury a purported confession of the defendant, over objection by the' defendant that the purported confession be excluded because of the statement of the witness, E. B. Eagan] that he told the defendant, if he would confess, that punishment would be lighter, as it was customary for it to be lighter for those that confessed. On the trial of the case, with the witness E. B. Eagan on the stand, on motion of the defendant the jury was excluded, and the following evidence was given by the witness, E. B. Eagan, as to the purported confession. [Then follows the evidence of the witness Eagan as set out in full in the foregoing statement of facts.] At the conclusion of the witness’s testimony with the jury retired, counsel for the defendant moved that the purported confession be excluded, because -the statement of the witness was that he told the defendant that if he would confess that punishment would probably be lighter, as it was customary for it to be lighter for those that confessed. The court overruled the motion of the defendant, to which ruling of the court defendant then and there excepted and here and now excepts and assigns the same as error, and defendant asserts that the evidence of the witness E. B. Eagan shows that the purported confession was not made by the defendant voluntarily without being induced by another by the slightest hope of benefit or remotest fear of injury, and that the court erred in allowing the said E. B. Eagan to give testimony to the jury, quoting the purported confession, over the appropriate objection of counsel for the defendant.”
(2) “Because the court erred in overruling .the following motion of the defendant, made after all the evidence was in: ’We move the court to exclude from the consideration of the jury the purported confession, on the ground that it was obtained from defendant by inducement or hope of reward, and because it was not made voluntarily without being induced by another by the slightest hope of benefit or the slightest fear of injury.’ To the Tilling of the court in not excluding from the consideration of the jury the purported confession defendant then and there excepted and here and now excepts and assigns the same as error. ■ The witness for the State, E. B, Eagan, testified, with-the jury excluded, that ’I *586 liave heard people tell him that if he was guilty the best thing to do was to confess so it would be lighter on him. I might have told him that myself. I told him I had known of the court being lighter when a man confessed, and that' the court would be lighter on any of them if they told the truth. I told him in a lot of cases they are lighter if the prisoner confesses. I told him whenever people confessed the courts were lighter on them if they confessed and told the truth.” The witness, E. B. Eagan, testified, on examination before the jury, as follows: cSomebody could have told him that in ordinary cases of this kind when a man confessed it is ordinarily lighter on him; but I don’t remember, there has been so much talk going on. I told him if anybody would tell the truth the court was always more lenient with them. I heard one man tell him it looked like he was going to the electric chair and he better get right with God. I don’t know the longest period I ever talked to him before the confession; it was a pretty good while; it might have been more than twelve hours, twenty-four hours, more or less.’ Geo. D. Anderson, sherifil of Peach County, testified as follows: ‘I told him that if h'e would confess that was his only chance of escaping the electric chair. I told him if he was guilty, to confess, I did my best to get him to confess. The only hope of benefit held out to him was that that was the only chance. When I said that was his only chance I told him nobody could promise him any help, but if it was me and I was in it I would confess. I think there was some encouragement that to confess was his only chance to escape the electric chair. I knew they got Shorty Anderson to try to find out what he could while he was in jail. The officers led him to believe he couldn’t hurt himself the way the thing was, as they had evidence on him and none on anybody else; in other words, it couldn’t hurt him to confess. I think I led him to believe it might help him to confess.’
“In view of the testimony above quoted of E. B. Fagan and George D. Anderson, the defendant at the close of the case made the motion to exclude the purported confession testified to by E. B. Fagan, and moved to exclude tlie written confession identified by E. B. Fagan as signed by the defendant, on the grounds set out above, and defendant then and there excepted to the ruling of the court in not excluding the purported confession from the consideration of the jury, and here and now excepts and assigns the same as *587 error on the ground that the evidence conclusively shows that the purported confession was not obtained from the defendant without inducement or hope of reward, and because it was not made voluntarily without being induced by another by the slightest hope of benefit or the slightest fear of injury.”
Fagan, a witness for the State, testified: “I had two letters from him, one on one day and one on the next, and I went to see him that night after everybody was asleep and it was after 12 o’clock. I had not talked to him about the case that day, I hadn’t said anything to him in four, five, or six weeks. The letters came to me, but I hadn’t said anything to him.” At this point the court addressed the jury: “Gentlemen of the jury, in admitting the evidence of confessions, whether coming from this witness or subsequent witnesses, the court instructs you in order to make a confession admissible it must have been freely and voluntarily made without being induced by another by the slightest hope of benefit or the remotest fear of injury. The court is prima facie admitting this evidence to you for your consideration as evidence upon the confession, but you, after all, are the judges as to whether or not this testimony was freely and voluntarily made, this confession by the defendant, without being induced by the slightest hope of benefit or the remotest fear of injury. If you find a confession was freely and voluntarily made, it will be considered by the jury with all the other evidence in determining the guilt or innocence of the defendant. If, in the opinion of the jury, you believe the confession was not freely and voluntarily made, you will not consider it at all.” In view of the evidence on the subject of confessions, the court did not err in submitting to the jury the question of whether the alleged confessions were freely and voluntarily made. Bailey v. State, 80 Ga. 359 (2) (9 S. E. 1072); Thomas v. State, 84 Ga. 613 (5) (10 S. E. 1016); Cantrell v. State, 141 Ga. 98 (4) (80 S. E. 649). Where a considerable time has elapsed between the .oiler of an inducement to confess and the making of the confession, the question of whether or not the confession was induced or was free and voluntary is for the decision of the jury. Milner v. State, 124 Ga. 86 (52 S. E. 302); Waycaster v. State, 136 Ga. 95, 100 (70 S. E. 883); Elder v. State, 143 Ga. 365 (2) (85 S. E. 97); Nix v. State, 149 Ga. 304 (100 S. E. 197). Under the evidence in the ease the court did not err in allowing the alleged confessions to go to the jury under proper instructions.
*588 Ground 5 of the amendment to the motion for new trial is as follows: “Because the court erred in his charge to the jury in stating the contention of the State (paragraph 3, page 30, brief of evidence), and, after so charging the contention of the State, in failing to state to the jury in his charge the contention of the defendant, which was highly prejudicial and harmful to defendant, in that the jury did not have for its consideration from the court the contention of the defendant, and the statement of the contention of the State in the charge of jury [court], without the statement of the contention of the defendant, might be construed by the jury as an expression of opinion by the court; and movant assigns the failure of the court to so charge as error.” This ground is without merit. The court charged the jury: “I charge you that the defendant enters upon the trial of his case with the presumption of innocence in his favor, and that presumption remains with him throughout the trial until it is overcome by proof to your satisfaction beyond a reasonable doubt. If the jury has a reasonable doubt as to the guilt of the defendant under the facts and circumstances of this case, including the defendant’s statement, then I charge you the defendant would be entitled to the benefit of that doubt with which he enters upon the trial of his case, and it would be your duty to acquit him. . . If you have any reasonable doubt of this defendant being or was a coconspirator, or was there at the time of the killing of Mrs. Hartley, although you might find under the circumstances the crime was murder, you would not be authorized to find this defendant guilty.” In the absence of a timely and appropriate request for a fuller charge, it was not error to set out more in detail the defendant’s contentions.
In grounds 6 and 7 of the amendment to the motion for new trial error is assigned on the following charge of the court: (6) “If you believe beyond a reasonable doubt that the defendant, Albert Jackson, in this county and State, at or prior to the time stated in the indictment, did form a common intent with others to “•■commit a larceny from the house of Mr. Green Hartley, and if you should further believe that in pursuance of such common intent and purpose the defendant and such other persons went to the house of Mr. Green Hartley with such common intent' and purpose to commit such larceny, and that in furtherance of such common intent and purpose to commit such larceny one or more of them *589 present struck and beat his wife, Mrs. Jeffie Hartley, with bludgeons of wood or other instruments and killed her in furtherance of such common act and intent, and that the defendant was there aiding and abetting in the commission of the act, then in that event each and all so present aiding and abetting in the commission of the crime would be equally guilty of the offense of murder, whether the defendant actually struck the blows that killed the deceased or not. It is not necessary that the crime of murder should have been a part of the original design or not, but it is enough if the jury believes beyond a reasonable doubt that the murder of Mrs. Hartley was one of the incidental consequences of the execution of a common design and intent and purpose to commit a larceny from the house of Mr. Hartley, and that it did appear at the moment to one or more of the participants in the common criminal intent to be expedient for the common purpose and in consequence of which Mrs. Hartley was slain in her home, the intent of the actual slayer is imputable to his coconspirators.” (7) “If you believe that the defendant entered into a conspiracy to commit a larceny from the home of Mr. Hartley, and that while he and his conspirators were actually in the act of committing the larceny he, the defendant, repented of his desire and purpose to carry out the common purpose and intent to commit said larceny, and before the consummation of the larceny he sought to prevent its commission by beseeching the other eoconspirators not to commit the act of larceny, and that he in good faith abandoned the intention to commit the crime of larceny or to participate in the killing of Mrs. Hartley, and did not participate in the commission of the larceny or in the killing of Mrs. Hartley, then you should acquit him and find him not guilty by your verdict.” Movant insists that said charge was erroneous and not sound as an abstract principle of law. This contention is without merit. Gore v. State, 162 Ga. 267 (134 S. E. 36).
Headnotes 3 and 4 require no elaboration.
The court did not err in overruling the motion for new trial.

Judgment affirmed.

All..the Justices concur, except Bussell, G. J., who dissents.