BRYANT *v.* THE STATE.

No. 13552.   January 15, 1941.   Rehearing denied March 14, 1941.

*Benning M. Grice, J. Douglas Carlisle,* and *W. A. Bootle,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, Charles H. Garrett, solicitor-general, Duke Davis* and *C. E. Gregory Jr., assistant attorneys-general,* contra.

JENKINS, Justice. As to the divisions of the syllabus numbered 1, 11, 12, 13, and 14, some elaboration appears to be appropriate.

■ ■ ■ Inasmuch as the pressure of the case appears to devolve largely upon the question as to whether the original confessions made by the defendant to officers were obtained by coercion, and therefore should have been excluded on objection at the time of their admission, or should have been ruled out on subsequent motion, with the result that other subsequent confessions and incriminatory statements should also have been excluded on the theory that the previous undue influences still operated on the mind of the defendant so as to have caused these later confessions and statements, otherwise wholly unexceptionable, we have thought it proper to embody in this decision a comprehensive summary of all the voluminous testimony bearing on these questions. We have thus sought to include in the statement of facts every portion of the testimony relating to such contentions of counsel for the defendant in their presentation of the case to this court. In so doing, a large part of the testimony of these officers, both as to what the defendant said and the circumstances of his statements, has been incorporated. This was necessary for the reason that the circumstances are so intermingled with the statements that the only method of presenting the circumstances is to include much of the officers' testimony in its entirety. The principles in the syllabus seem well supported by authority—that before a confession or incriminating statement is admissible in evidence, a prima facie showing as to its voluntary character must be made; and if this preliminary proof fails to make such a showing, the confession or statement must be excluded (*McLemore* v. *State,* 181 *Ga.* 462, 182 S. E. 618, 102 A. L. R. 634, 643, notes; 38 A. L. R. 120); that after such proper preliminary proof the confession or state-

ment becomes admissible, but the defendant may by evidence attack its voluntary character, and in that event the question as to voluntariness is for the jury (*Bradberry* v. *State,* 170 *Ga.* 859 (4), 865, 866, 154 S. E. 344; *Price* v. *State,* 114 *Ga.* 855 (3, 4), 40 S. E. 1015; *Carr* v. *State,* 84 *Ga.* 250, 255, 10 S. E. 626; *Thomas* v. *State,* 84 *Ga.* 613 (3, 5), 619, 10 S. E. 1016; *Irby* v. *State,* 95 *Ga.* 467 (2), 20 S. E. 218; *Claybourn* v. *State,* 190 *Ga.* 861, 866, 11 S. E. 2d, 23); that where the voluntary character of a confession is made to appear by unequivocal evidence, the mere existence of attendant facts and circumstances, as shown on cross-examination of the witnesses, which do not directly or necessarily dispute the prima facie showing, will not require exclusion of the confession from evidence, but the question as to its voluntary character should properly be left to the jury (*Cantrell* v. *State,* 141 *Ga.* 98 (4), 80 S. E. 649; *Bradberry* v. *State,* supra); and that ordinarily the question as to whether confessions and incriminatory statements, unexceptionable in themselves, were made under previous undue influences still operating on the mind of a defendant, is not a question of law for the court, to be resolved by excluding such evidence, but is a question of fact for the jury. *Pines* v. *State,* 21 *Ga.* 227; *Valentine* v. *State,* 77 *Ga.* 470 (3), 480; *Milner* v. *State,* 124 *Ga.* 86 (52 S. E. 302); *Jackson* v. *State,* 172 *Ga.* 575 (2, *a, b*), 587 (158 S. E. 289).

In all jurisdictions where the duty is placed on the State to show the voluntary character of a confession, it seems to be the rule that, in deciding whether a sufficient prima facie showing has been made to authorize the admission of the confession, the judge "is vested with a considerable measure of discretion, which discretion, however, should be exercised with great care, to the end that the due and proper enforcement of the law on the one hand is not impeded, and that no injustice is done [the] accused on the other." 22 C. J. S. 1469, § 838, and cit. The court "must determine the weight of the circumstances relied upon to admit or exclude the confession in the particular case." 20 Am. Jur. 457, § 537, and cit. Thus, in Hopt *v.* Utah, 110 U. S. 574 (4), 583, 4 Sup. Ct. 202, 28 L. ed. 262), the United States Supreme Court said: "The admissibility of such evidence so largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases.

As the question is necessarily addressed, in the first instance, to the judge, and since his *discretion* must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion." In that case the confession to the witness, a detective, was held properly admitted upon his testimony that, so far as he knew, "the confession was voluntary and uninfluenced by hopes of reward or fear of punishment; he held out no inducement, and did not know of any inducement being held out to defendant to confess;" even though the *testimony of the witness* as to the attendant circumstances also showed that when he made the arrest, the father of the deceased "may have made a motion to draw a revolver on the defendant," and the witness "may have prevented him from drawing a weapon, and thinks he told him to do nothing rash;" that "at the arrest a large crowd gathered around the defendant; [the witness] hurried him off to the jail, sending with him a policeman, while he remained behind, out of the hearing of the policeman and the defendant;" that "in two or three minutes [the witness] joined them, and immediately the accused commenced making a confession;" and even though the witness did not know "what conversation, if any, occurred between [the defendant] and the policeman during the . . two or three minutes preceding the confession;" and the prosecution did not call the policeman as a witness. In *McLemore* v. *State,* supra, the State's witness testified that he did not know whether he told the defendant that "it would be better for him to go on and tell the truth . . it would be better for him to make a confession . . it would be better to tell the whole story, to come clean . . [and] it would be better for him just to make a full disclosure;" and the evidence of a confession was excluded on the failure of the State to make a prima facie showing, since this testimony itself failed to make the required showing that the accused was not influenced by hope of benefit or fear of injury.

Where undue statements to a defendant thus clearly appear on a *cross-examination* of the State's witnesses, it is the duty of the court to exclude the confession or criminating admission made by reason of such statements. *Green* v. *State,* 88 *Ga.* 516, 519 (15 S. E. 10, 30 Am. St. R. 167). A like rule has been applied where the evidence as to the facts and circumstances of the confession *de-*

*manded* the finding that the confession was not made voluntarily. *Thomas* v. *State,* 169 *Ga.* 182, 184 (149 S. E. 871). It was there said (two Justices dissenting): "Under the facts of this case the evidence as to confession should not be admitted, and left to the jury to say whether it was voluntary, in pursuance of the general rule expressed in [*Griner* v. *State,* 121 *Ga.* 614 (6)], because the evidence of the sheriff, giving the testimony as to the confession, in substance admitting that the defendant had been taken from his custody 'and carried to the swamp' by a mob the night before the confession was made, *demands a finding* that the confession was not made voluntarily and without being induced by another by the slightest hope of benefit or remotest fear of injury." (Italics ours.) There are similar rulings by the United States Supreme Court. In Ziang Sung Wan *v.* U. S., 266 U. S. 1, 3, 15 (45 Sup. Ct. 1, 69 L. ed. 131), the accused was a sick man, very weak, exhausted, and emaciated. One or more police officers remained constantly in his room; another guard was outside the closed door. The accused was "subjected to persistent, lengthy, and repeated cross-examination," even after midnight, "sometimes . . subtle, sometimes severe," always "conducted with a view of entrapping [him] into a confession. . . On the eighth day the accusatory questioning took a more excruciating form . . continuously for ten hours, this sick man was led from floor to floor to examine and re-examine the scene of the triple murder and every object connected with it, to give explanations, and to answer questions," as to "the places where the dead men were discovered;" and the accused was shown the revolver supposed to have been used, with bloodstains thereon, and on the floor and stairs, the clothes of the murdered men, a bloody handkerchief, and their photographs as they lay dead. This interrogation, which "passed at times from inquiry into command," continued *from 7 at night till 5 in the morning,* with "not a moment of sleep . . allowed" to the accused. The questioning was then resumed in twenty minutes, and continued four more days. Under these circumstances of *manifest coercion,* the court held that the testimony "*left no room for a contention* that the statements of the defendant were in fact voluntary;" and that "the *undisputed facts* showed that compulsion was applied," as to which "there was *no issue* upon which the *jury* could properly have been required or permitted to pass." (Italics ours.)

In Bram *v.* U. S., 168 U. S. 532, 539, 561 (18 Sup. Ct. 183, 42 L. ed. 568), it appeared that, after a murder had been committed on the high seas, the accused was put in irons and the vessel brought to a port, where the witness to whom the confession was made had the accused brought "as a prisoner to his private office, and there proceeded to take *extraordinary liberties* with him; he *stripped* him;" and the accused "obeyed every order and direction that the witness gave." The United States Supreme Court there held, that where the testimony of this officer showed an incriminatory statement by the accused, attended by the circumstances stated and "whilst the detective was in the act of so stripping him, or after he was denuded," the statement was not voluntary. As to other cases of manifest coercion, see White *v.* Texas, 309 U. S. 560 (60 Sup. Ct. 688, 84 L. ed. 947) ; Chambers *v.* Florida, 309 U. S. 227 (60 Sup. Ct. 472, 84 L. ed. 716). However, the exercise of a sound discretion by the court in admitting a confession, after a prima facie showing of its voluntary character, is not precluded by testimony as to additional facts, merely that the accused was in custody or under arrest at the time the confession was made (*Hilburn* v. *State,* 121 *Ga.* 344, 49 S. E. 318) ; or because the confession was "made at night, in the woods, while the accused was handcuffed, and in the presence of a deputy sheriff and a detective, and while being transferred from one jail to another at the instance of his father" (*Simmons* v. *State,* 181 *Ga.* 761 (4, 5), 764, 765, 184 S. E. 291 ; *Wilburn* v. *State,* 141 *Ga.* 510 (5, *a*), 81 S. E. 444) ; or by the fact that in questioning the accused the officers may have told him that "he was lying and that they knew of his guilt," and he may have been "carried from place to place without authority of law, and . . for some days he saw neither relatives nor an attorney" (*Claybourn* v. *State,* supra) ; or that the accused was persistently questioned without the privilege of counsel. *Douberly* v. *State,* 184 *Ga.* 573 (2), 192 S. E. 223; 22 C. J. S. 1434, § 817. In all such cases the mere existence of one or more of those facts will not divest the trial court of discretion to admit the confession or incriminatory statement in evidence, and submit to the jury the question as to whether it was voluntary, unless the circumstances were so unusual that they must be said to show as a matter of law that such confession or statement was not voluntary.

In the present case—*as to the confessions made to the officers*—on the direct examination of these witnesses, the prima facie showing of the State as to the voluntary character of the statements made to them was sufficient. On cross-examination nothing was developed in direct conflict with their testimony to that effect. However, the defendant contends that the facts and circumstances developed on cross-examination show the confessions to have been involuntary, because of the confinement of the defendant in jail, the denial of communication with his relatives or an attorney, and the manner of questioning the defendant during parts of six days before he made his first oral confession to the officers. Upon an examination of the officers' testimony, which appears in the statement of facts, and under the preceding rules, it can not be held that the judge erred in admitting the testimony of the officers, where he submitted fully and fairly to the jury the issue of voluntariness. The testimony as to the manner of questioning in no wise shows such a case as appears in any of the decisions by the United States Supreme Court or this court where the confession was held inadmissible. While the examinations of the defendant continued for parts of six days before he made his first oral confession to the two deputy sheriffs, and were mostly at night when they had no other duties, the conversations were unattended by any harsh treatment, threats or menaces, acts or conduct, and were in no case prolonged over an hour or so except on the night of the first confession, preceding which the defendant himself sent for the officers, began the confession within five minutes after the conversation started, and later also sent for the brother of the deceased, in whose presence he continued the confession apparently without any need of protracted questioning. There was some testimony by the officers on cross-examination as to having given nickels or dimes to the defendant for smoking tobacco, "four pennies" or other small amounts "to gamble on" at the jail, a coca-cola, and a cigarette. These acts, at the request of the defendant and mostly in the presence of other witnesses, can not be conceived as indicative of any attempt to bribe a confession; but they indicate the absence of any threatening or unkindly attitude on the part of the officers. While the officers were cross-examined at length as to their expectation of a reward, and as to what they *intended and expected* in obtaining the confessions, and what the defendant

*might* or *might not* have done if he had not been confined or questioned, such testimony as to their private motives, expectations, or speculative opinions has no bearing on the crux for determination, except as it might be taken to throw indirect light on what was actually said and done to the defendant. As to the written confessions of November 2 and 6, and accompanying oral confessions, which were made considerably after the first oral confession of October 21 to the officers, and the voluntary character of which last confessions was prima facie shown by other witnesses, including the assistant solicitor and the stenographer of the solicitors, this evidence was plainly admissible under the rule in par. 1 (*b*) of the syllabus, and was properly left to the jury under full and fair instructions to determine as to its voluntary character. For the same reason, the testimony of the brother of the deceased as to a subsequent confession made to him at the plant of the homicide, and as to other oral confessions made in the presence of this witness, the officers, and others, was admissible under the prima facie showing made by his clear and positive testimony. The incriminatory notes written by the defendant to a fellow-prisoner and an oral confession made to another fellow-prisoner were admissible, although the times when they were written or made with relation to the examinations by the officers are not clear from the evidence, since these incriminating statements and confession appear to have been written or made on the initiative of the defendant himself, without any testimony that they resulted from anything that the officers said or did. In any event, it was for the jury to say whether such notes and confession were voluntary.

(*c*) The constitutional contentions of the defendant are based on two recent United States Supreme Court decisions, above cited, White *v.* Texas and Chambers *v.* Florida. See also Norris *v.* Alabama, 294 U. S. 587 (55 Sup. Ct. 579, 79 L. ed. 1074). As indicated in the syllabus, while we recognize fully the right and duty both of this court and the United States Supreme Court, in a case where an alleged coerced confession or other violation of due process is involved and the question has been properly raised, to examine the record to determine from the facts whether there was such an infringement, and while we recognize that the findings of a jury are not of such finality as to deprive the reviewing courts of jurisdiction to decide for themselves what the evidence shows,

nevertheless, as was said in *Claybourn* v. *State,* supra, "We do not construe the . . language [in the Chambers decision] to mean or imply that the Supreme Court can or will invade the province of the jury and usurp the function of the jury to decide issues of fact." From an examination of the United States Supreme Court decisions it appears that while the question of coercion or other violation of due process was there contended to be in issue and the facts to be in controversy, yet *no issue actually existed,* either because of the facts themselves under undisputed testimony, or because *the only rational inference* (even though the evidence was in technical dispute) was the one conclusion that the confession was obtained by coercion, or that due process had otherwise been violated.

■ Under our system of jurisprudence, the functions of witnesses, the jury, and the court are distinct and defined. This may not be so apparent under the Roman law, where mere opinion evidence on ultimate questions of fact may have been permissible. Under our Code, a defendant who seeks to avail himself of the defense of insanity at the time of an offense must show that he was then an idiot, or that he was a lunatic or afflicted with insanity, without a lucid interval at the time of the offense. §§ 26-301, 26-303, 26-304. The test of criminal responsibility in all cases is whether the accused could distinguish between right and wrong with respect to the particular act, with the one recognized exception that, although "a man has reason sufficient to distinguish between right and wrong, . . yet [if] in consequence of some delusion the will is overmastered and there is no criminal intent," he is not responsible, "provided that the act itself is connected with the peculiar delusion under which the prisoner is laboring." *Rozier* v. *State,* 185 *Ga.* 317, 320 (195 S. E. 172), and cit. The ultimate fact to be determined by the jury under instructions from the court is responsibility. Upon this question the opinion of neither an expert nor a non-expert witness is permissible. It has been held that a witness, stating the facts on which his opinion is based, if a non-expert, or showing familiarity with the defendant's mind, if an expert, may state his opinion as to whether the defendant had "sufficient mind to know the difference between right and wrong." *Hinson* v. *State,* 152 *Ga.* 243 (3, *a*) (109 S. E. 661). As is said in 4 Wigmore on Evidence (2d ed.), 176, § 1958 (2): "The

capacity of an accused person to be legally responsible for the crime charged depends also upon a legal definition; and it would therefore be equally improper to ask for the witness's testimony without first eliminating the element of law from the question. But an inquiry whether he knew the difference between right and wrong, or whether his will could control his actions, would be proper." The same writer, however (p. 131, § 1937), draws a distinction between an opinion as to sanity and an opinion as to "criminal capacity" or responsibility; "the latter sort of opinion [being] inadmissible . . because a question of law may be involved, and witnesses' conclusions are not needed on such points." A similar rule has been stated in 3 Chamberlayne on Evidence, 168, § 2012, as follows: "The attending physician must confine himself to medical inferences. He is not warranted in judging of the mental condition by *legal* standards. Such a mental result will amount to a conclusion of law and be subject to the administrative objections attaching to the reception of that form of reasoning. Thus, he will not be allowed to say that a person who purports to have executed a will was legally devoid of testamentary capacity by reason of mental imbecility or aberration." See also *Morgan* v. *Bell,* 189 *Ga.* 432, 437, 438 (5 S. E. 897), and cit.; *Smoot* v. *Alexander,* 188 *Ga.* 203 (3 S. E. 2d, 593). Accordingly, the judge did not err in refusing to allow an expert witness to answer the following question: "According to your knowledge of psychiatry, is an imbecile such as [the defendant] responsible?" Nor did the judge err in refusing to allow this witness to answer the question, "Is an idiot responsible?" although it appears that the expected answer to both questions was that "I do not think that [the defendant] is responsible." Moreover, as to the second question, it appears that the witness had in fact testified that the defendant was not an idiot.

■ Giving to the jury preliminary instructions as to insanity and weakmindedness while such testimony was being admitted and before the conclusion of the case, in order to guide the jury as to the purposes for which such evidence was admitted and could be considered, was not untimely or improper. See *Pennington* v. *Perry,* 156 *Ga.* 103 (4) (118 S. E. 710); Troutman *v.* U. S. 100 Fed. 2d, 628, and cit. The inclusion of delusional insanity in the definition of insanity and the test of criminal responsibility

can not be taken as prejudicial to the defendant, where the testimony as to insanity had not been completed and the judge could not determine its scope, and where he expressly cautioned the jury that they might consider the subject of delusional insanity, "if there should be any evidence of such insanity," and limited the preliminary instructions to the evidence "that has been or may be introduced," with the further caution that in stating the law "just given," or "previously given," "the court is not expressing any opinion as to what evidence, if any, has been or might be introduced by the defendant, and is not intended to have any effect, restriction, or limitations upon the defendant with reference to any evidence of any nature which he may consider relevant and material to his case and which he may offer during the progress of the trial." See *Davis* v. *State,* 190 *Ga.* 100 (4, *a*) (8 S. E. 2d, 394). Nor were the preliminary instructions subject to the exception that they limited a consideration of evidence as to weak-mindedness merely to the question whether the alleged confessions were made and were voluntary, without permitting the jury to consider the testimony on the general defense of insanity. The jury were told, in these instructions, that even though they found that the confessions had been made, "yet if the defendant shows to your reasonable satisfaction that at [such] time or times . . the defendant was an idiot, or a lunatic, or an insane person, then said confession or confessions would have no probative value or force whatever, and you should disregard it or them entirely in your consideration of the case." In the final charge the court said: "The instructions now being given you . . are intended to be complete and cover the whole case. *These instructions supersede any other instructions* given to you during the progress of the case, to aid you, if they did, in distinguishing and applying the testimony, and not intended to be complete. . . You *apply the law now being given you* by the court to the facts of the case, as you find them to be, and make your findings as to the truth of the same." Not only in this charge, but in a recharge given by request of the jury, they were fully instructed as to the defense and law of insanity, and that, irrespective of the question as to confessions, they should "acquit the defendant" if they found him to be an "idiot or a lunatic or an insane person."

It is the general rule that where there has been an erroneous

instruction calculated to mislead the jury on a material issue, the error is not cured by merely afterwards giving a correct instruction. The basis of the rule is that "the jury can not be expected to select one part of a charge to the exclusion of another, nor to determine whether one part cures a previous error, without having their attention specially called thereto, and being instructed accordingly." *Gill* v. *Willingham,* 156 *Ga.* 728 (4) (120 S. E. 108); *Morris* v. *Warlick,* 118 *Ga.* 421 (2) (45 S. E. 407). This rule has been applied in certain cases, not only where the correct charge was given after intervening instructions, but where it immediately followed the correct charge. *Savannah, Fla. &c. Ry. Co.* v. *Hatcher,* 118 *Ga.* 273 (45 S. E. 239); *Caison* v. *State,* 171 *Ga.* 1 (3), 7 (154 S. E. 337); *Atlantic Coast Line R. Co.* v. *Canty,* 12 *Ga. App.* 411 (2), 415 (77 S. E. 659). Error is assigned on the instruction: "The law does not attempt to measure the degree of insanity which renders a person irresponsible for his act. That is a question for the jury." Immediately preceding this charge, the test as to sanity by ability to distinguish between right and wrong was correctly given; and immediately following the language in question the judge, in defining the essential criminal intent, stated that the question was whether the defendant "was mentally incapable of distinguishing between right and wrong with reference" to the act. However, he still referred to the question as solely a "question of fact." Even if this last instruction could be taken as an entirely correct statement, yet under the unanimous and controlling decision in *Geer* v. *State,* 184 *Ga.* 805 (4), where the correct and erroneous charges were in juxtaposition, and the erroneous language was almost identical with that in the present case, a new trial must be granted. In that case the charge was: "The law does not attempt to measure the degree of insanity which renders a man or woman legally irresponsible for his or her acts. That is a question of fact for the jury." The vice of the instruction, as held in the *Geer* and *Caison* decisions, is that "the law does fix the degree of insanity which renders a man legally irresponsible for his acts."

■ Evidence was offered by the defendant for the purpose of explaining his alleged flight from the city several months after the homicide, and his continued absence therefrom. A witness was asked the following question: "Tell the court what [the foster mother of the defendant] told you to say to [the former employer of

the defendant], and what [this employer] told you to say to [her]." The expected answer, as stated to the court, was: She "asked me to talk to [the former employer of the defendant] about the . . folks [at the plant where the defendant had worked] shooting at [the defendant], and causing . . the defendant to leave the city of Macon; and [she] asked me to ask [the former employer's] consent for . . the defendant to come back to Macon. I did comply with [her] request, and talked with [the employer]. [He] told me that he would not drop the charge against [the defendant], and I told [her] what [the employer] said. . . The mother of the defendant . . told me that [he] was away from Macon at the time, and that she wanted him to come home. [The employer] told me that [the defendant] had had some trouble with one of [the] employees at the [plant], a Mr. Garvin, and that [the employer] would not agree for [the defendant] to come back unless he went through with the case." The following additional question was asked of the same witness: "What did you tell [the foster mother of the defendant] after you had talked to [the former employer of the defendant]?" the expected answer to which, as the court was informed, was: "I told [her] that I had talked with [the employer], and that [he] would not agree for [the defendant] to come back to Macon unless he would go through with the case; that [the defendant] had had some trouble with [an] employee, Mr. Garvin." As recited in these grounds of the motion for new trial, "At the time of the adverse rulings herein complained of, movant's counsel stated to the court that he expected to connect up said evidence by showing that the above mentioned conversations between [the foster mother of the defendant] and [the witness] and then between [the witness] and [the former employer], and then between [the witness] and [the foster mother] were reported to . . the defendant, who because of said conversations remained away from the city of Macon until a later date." Under the Code, § 38-302, "When, in a legal investigation, information, conversations, letters and replies, and similar evidence are facts to explain conduct and ascertain motives, they shall be admitted in evidence, not as hearsay, but as original evidence." While it has been held that the application of this rule should be "carefully guarded" (*Brown* v. *Matthews,* 79 *Ga.* 1 (4), 4 S. E. 13), the defendant in this case

was entitled to explain, if he could, the reason of his alleged flight and the reason of his continued absence from the city of the homicide; and it was error to exclude the testimony offered for this purpose.          *Judgment reversed. All the Justices concur.*