1. "To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury." Code, § 38-411. Before an alleged confession or incriminatory statement can properly be admitted in evidence, there must be a prima facie showing made by the State or elicited by the court that it was freely and voluntarily made, without hope of reward or fear of punishment. If such preliminary proof fails to meet the requirements of the statute, it is the duty of the court to exclude the confession from evidence. Where such proper preliminary proof has been made, the confession or incriminatory statement becomes admissible; but the defendant is privileged to attack such showing by proof that the confession or incriminatory statement was not voluntary or was made with hope of benefit or fear of injury. In that event, the question as to the voluntary character of the confession becomes one for the jury.
(a) In the instant case, with respect to the alleged original confessions made to the officers — since such a prima facie showing was made by the unequivocal testimony of the officers, and since the proved facts and attendant circumstances elicited by the defendant on cross-examination of these witnesses in no wise directly disputed their testimony, but at most merely presented an issue to be resolved by the jury as to whether or not the evidence as to the surrounding facts and circumstances thus elicited could be taken to impair the unequivocal preliminary proof, the court did not err in admitting the confessions made to the officers, or in refusing to exclude them on subsequent motion, but properly left it to the jury to determine whether or not such confessions and incriminatory statements were in fact voluntarily made.
(b) With respect to the subsequent confessions and incriminatory statements made to other persons, it is the rule that the question as to whether or not such subsequent confessions and statements, themselves wholly unexceptionable, were made under previous undue influences still operating on the mind of the defendant, is not a question of law for the court, but one of fact for the jury. Accordingly, as to these subsequent confessions and incriminatory statements, the court did not err in refusing to exclude such evidence and in submitting to the jury the question as to its voluntary character.
(c) Although the facts in evidence will be examined to determine whether or not they show a conviction by use of a coerced confession, in violation of the due-process clause of the 14th amendment to the Federal constitution (Code, § 1-815), or the provision in the State constitution against self-incrimination (art. 1, sec. 1, par. 6; Code, § 2-106), when such a question has been properly raised and presented, yet, where a prima facie case as to the voluntary character of the confession has been made, it is not within the power of this court to usurp the function of the jury in passing upon an issue, and to override their verdict supported by legal evidence and upheld by the judge in refusing a new trial, or to reverse a ruling admitting the confession in evidence, unless the evidence requires but one rational inference, that the confession was *Page 687 
unlawfully obtained. Under this and the preceding rulings, the judge did not err in refusing to exclude from evidence the alleged illegal confessions and incriminatory statements of the defendant.
2. The court did not err in excluding from evidence accusations and sentences in a city court against a witness for the State, who on cross-examination testified that he had never been in jail on any charge before the one on which he was then serving a sentence: first, since the offenses did not involve moral turpitude, the accusations were inadmissible to prove general bad character; and second, since testimony merely that a witness has been in jail is irrelevant (Beach v. State, 138 Ga. 265, 75 S.E. 139; Whitley v. State, 188 Ga. 177, 179 (5), 180, 3 S.E.2d 588, and cit.; Reid v. State, 49 Ga. App. 429, 176 S.E. 100, and cit.), and "a witness may not be impeached by simply showing that he had made a statement not material to the issue," such evidence was inadmissible to controvert the witness. Green v. State, 43 Ga. 368 (2); Mitchum v. State, 11 Ga. 615 (8); Clarke v. State, 41 Ga. App. 556 (153 S.E. 616); Poland v. Osborne Lumber Co., 37 Ga. App. 212
(139 S.E. 734).
3. The court did not err in excluding testimony of two witnesses, as to whether in their investigations at pawnshops they had found "any trace" of the pistol with which the alleged homicide had been committed, and whether they had found "where [the pistol] came from there," since, the weapon being in the possession of police officers at the time of the investigation, the expected answers of the witnesses would have rested upon hearsay.
4. There was no error in excluding, as hearsay, the testimony of a newspaper reporter as to what the solicitor-general told him "of the solution of the . . killing at that time." The expected answer was inadmissible also as expressing a mere opinion that some one of three men then under arrest had fired the fatal shot, the defendant not then being in custody. See Green v. State 112 Ga. 638 (37 S.E. 885), and cit.; Woolfolk v. State, 81 Ga. 551 (8 S.E. 724); Tiller v. State, 96 Ga. 430 (3), 433 (23 S.E. 825); Beach v. State, 138 Ga. 265 (2) (supra).
5. The court properly refused permission to counsel for the defendant to read and comment, in his final argument to the jury, on an extract from a book entitled "Convicting the Innocent," relating to other criminal cases which involved the innocence or sanity of other accused persons, the methods of obtaining confessions in those cases, and the report of a Federal commission on lawlessness in law enforcement, together with facts in those extraneous cases and investigations, and the opinions of the author and physicians as to such matters. See Jones v. State, 166 Ga. 251, 254 (142 S.E. 866); Quattlebaum v. State, 119 Ga. 433 (46 S.E. 677); Johnson v. State, 95 Ga. 685 (22 S.E. 694).
6. The use of the word "onus" instead of burden in stating that it was for the accused to establish his contention of alibi, "not beyond a reasonable doubt, but to the reasonable satisfaction of the jury," could not reasonably have misled them, especially in view of the immediately succeeding explanation, that "if the evidence as to alibi . . has established to your reasonable satisfaction that the defendant was elsewhere *Page 688 
when the alleged crime was committed, if one was committed, it would be your duty to acquit the defendant."
7. The introduction of instruction as to conspiracy with the words, "I think it proper to instruct you," did not place undue emphasis on this theory of the State and constitute an expression of opinion that the court thought the defendant guilty under that theory. The instructions on the subject of conspiracy were not erroneous as unauthorized by evidence. Nor were they subject to the additional exception that the court in effect told the jury that if the defendant participated in the offense as a conspirator he would be guilty without regard to whether he was insane by reason of inability to distinguish between right and wrong. Elsewhere the judge charged fully as to the defense and law of insanity, and it was unnecessary to repeat these instructions in immediate connection with the law of conspiracy. Nor could the failure to charge the law of conspiracy and the law of insanity in juxtaposition have reasonably misled the jury into thinking that the charge as to insanity referred only to the theory that the defendant was the sole perpetrator of the homicide.
8. The court, having fully and correctly covered the law of insanity in the general charge, except as to the instruction hereafter considered, did not err in refusing to repeat in effect, on a request, language already given. This request was properly refused for the additional reason that its reference to the "overwhelming power of mental disease" was not adjusted to the evidence, which was limited to a general deficiency and weakness of mind rather than a defect due to disease.
9. The request to state the defendant's particular contention that the homicide was committed by some one else, and that if from the evidence or the defendant's statement "there are circumstances indicating the guilt of a third person or persons sufficient to generate in your minds a reasonable doubt of the guilt of the accused, it would be your duty to acquit the defendant," was sufficiently covered by the general charge.
10. The request to charge, that, "unless you find that the alleged confession was voluntarily made under the rules I have heretofore given you in charge, the State's case is entirely dependent upon circumstantial evidence," coupled with a definition of circumstantial evidence, and a statement that such evidence should exclude every reasonable hypothesis except guilt, was covered by the general charge. The request was properly refused for the additional reason that it referred only to a "confession," whereas the State relied on several alleged confessions, both written and oral, besides incriminatory notes.
11. For the reasons in the opinion, it was not error to exclude the testimony of a psychiatrist that he did not think "an imbecile" or "an idiot such as" the defendant "is responsible."
12. There is no merit in the exceptions to preliminary instructions given to the jury, while testimony as to insanity and weakmindedness of the defendant was being given and before the conclusion of the case, in order to guide them in considering the purposes for which the testimony was admitted and could be considered.
13. For the reasons stated in the opinion, the instruction that "the law *Page 689 
does not attempt to measure the degree of insanity which renders a person irresponsible for his act" was reversible error, which was not cured by a correct statement of the legal rule and test as to responsibility in criminal cases immediately preceding and following the erroneous language.
14. Conversations and similar evidence, even though of hearsay nature, when they are "facts to explain conduct and ascertain motives," are admissible with guarded restrictions, under the Code, § 38-302. It was reversible error to exclude the testimony of a witness as to his conversations with the foster mother of the defendant and the former employer of the defendant, relative to the witness obtaining the consent of the employer to withdraw a charge against the defendant growing out of trouble with other employees, and obtaining the consent of the employer for the defendant to return to the city, and relative to the failure of the witness to obtain such consent, and his report to the foster mother of the unsuccessful conversation with the employer. This testimony was admissible to "explain conduct," in support of the defendant's explanation of his alleged flight and continued absence from the city, where counsel for the defendant stated to the court at the time of the exclusion that he expected to show by other evidence that these "conversations were reported to the defendant," and that "because of said conversations [the defendant] remained away from the city . . until a later date."
15. The remaining exceptions, relating to the refusal to declare a mistrial, on account of a remark by a witness for the State as to the defendant, and on account of alleged inaccurate remarks by the solicitor-general in his concluding argument to the jury as to the nature of certain testimony, present questions which need not be determined, since they are not likely to occur in a new trial. Upon the thirty-eight grounds, only on grounds 14, 15, and 34 did the court err in refusing a new trial.
 No. 13552. JANUARY 15, 1941. REHEARING DENIED MARCH 14, 1941.
Pertinent facts, in connection with the alleged illegal admission of confessions and incriminatory statements by the defendant, are as follows: The deceased, assistant manager of a refining company, was killed by a pistol shot about seven o'clock in the evening of January 28, 1939, at the plant in Macon; and the office was robbed of some $800 in cash and an undetermined amount of checks. Brinkley, a negro employee of the plant, testified, that as he was locking up the gasoline storage tanks an intruder with a hat over his face, who "was black" as to "what [he] discovered of him," held up this employee at the point of a pistol and locked him in the pump-house; that he heard the deceased scream and a pistol shot, climbed up the machinery in the house, escaped, saw the murderer running away, and gave the alarm. A negro girl saw *Page 690 
a negro man with a hat over his face running down an alley in the neighborhood, and testified that he had on overalls that seemed ragged on one side. Checks and the empty money-box were found by police officers in the rear of a house on an alley. Brinkley, the employee, was first taken into custody, but later released under bond. Later also Richard Collins was indicted for the homicide, extradited from New Jersey, and confined in Bibb County jail. The defendant in this case remained in the city until soon after April 28, 1939, when, after having drawn a knife and having had other trouble with employees at the plant where he was working, he left the city, went to relatives in Mayfield, Georgia, and to other relatives in Valdosta, Georgia, and returned to Macon on September 15, 1939; but soon went to Lizella, Georgia. He explained as the reason of his absence from the city that he heard officers were looking for him because of the trouble where he had been working. On October 15 he voluntarily surrendered at the Bibb County jail, stating to the jailer as his reason that he heard officers were looking for him because of the trouble with the other employees. A fellow-prisoner, Charlie Williams, occupying an adjoining cell, testified as to conversations through a small hole in the partition; and that the defendant had given him four notes on scraps of paper to deliver to Richard Collins, then confined in the jail because of the homicide. These notes were turned over to officers, and were put in evidence. In his statement to the jury the defendant said that two deputy sheriffs "scared me, and they had their pistols and they questioned me every night, and they said if I didn't admit killing [the deceased] they were going to blow my G — d-d brains out, . . if I didn't say I was the one that killed [the deceased]. Honest to God I didn't kill [him]; and they said they would see the judge for me and get me life sentence and then get a parole, and I could come back and take care of my mother. There is a hole up there in the cell that big around, and the pipe fits in there, and that steam pipe would be hot and Charlie Williams couldn't see through it, and you can't talk through it. They had my flap locked back, and I could not see my mother and father and sister or anybody. I could not see a soul in the world, . . and I could not see my lawyer or anybody, and the lawyer made arrangements for me to see my mother and sister, that is the only time I could talk to them." The deputies *Page 691 
denied that they made any such threat or promise to the defendant.
While the defendant thus attacked the alleged written and oral confessions made to the deputy sheriffs and other witnesses in their presence, who testified in the case, and in effect denied the alleged oral confession to Williams, the fellow-prisoner, he never denied the writing or giving of the four incriminatory notes to Williams for delivery to Collins. The authenticity of these notes was shown by testimony, and was not attacked. Nor did the defendant by his statement to the jury or by testimony attack the voluntary character of the alleged confession to Williams and of the incriminatory notes. It is merely contended that the influence of the alleged coercion by the officers as to the confessions made to them extended to and covered all this additional evidence, and made it inadmissible as also coerced.
In the signed first written confession of November 2, 1939, repeating oral admissions made to the officers beginning on October 21, five days after the first incarceration, the defendant implicated Richard Collins, who was confined in the same jail and for whom the notes were intended, two other negroes, Charlie Frazier and Sam Kemp, and Brinkley, the employee at the plant of the homicide. He said, that he had furnished his pistol to the three men first mentioned, and went with them to the plant, remained at the gate with Frazier, and saw the deceased in his office; that Collins and Kemp went to the back of the plant, and Kemp went in the office, fired the pistol, and the deceased fell into the yard; that Kemp took the cash-box, all four men ran away, and met later; that next morning, Kemp gave him fifty one-dollar bills; that the defendant carried the pistol home, put it between mattresses, later told the officers where the pistol was, and they went and got it; and that no one had threatened or made any promise to him. In the second written confession of November 6, the defendant said that he alone went to the oil plant and killed and robbed the deceased. He described in detail how this was done, where the money had been hidden and had been spent, and the checks had been thrown; and said that he had hidden the pistol in the mattresses, as stated in the first confession. The four notes read as follows: "Richard, I am going to say I bought the pistol, and Sam and Frazier came to me and borrowed it and said *Page 692 
they were going to the country at once, which I lent it to them, and what they did I don't know." "Richard, you stick to me, don't know anything about that. Sam and Frazier has gun and left me and you in a mess; you don't know nothing about it." "Richard, when the man carried me over to the other office, we say Sam did the killing and took the money and bought P. W. A. truck and went up north with the other, and that is all, and we come clear." "Richard, I done told that Sam did the killing and me and Frazier did the watching, and you say the same thing, and Sam took the money and bought P. W. A. truck, and we don't know nothing about it." The testimony of Williams (the prisoner in the adjoining cell) was, that the defendant talked to him through a hole by a steam-pipe; that the defendant said he previously had "close around $200 in less than three weeks," which the defendant had got from a filling-station, and said that "this man that got killed, I got the money from him and jumped the fence and went down the railroad." This witness testified that later, when they were in the same cell after Williams had told the officers as to this, the defendant said: "I am going to kill you . . you went to work and give my secret away . . you told them officers about my secret, that I killed that man;" and further testified that the defendant "grabbed the broom, and I jumped back, and he . . said he was going to burst my brains out." The defendant did not deny or offer evidence to rebut the testimony as to this conversation. On cross-examination, this witness further said the defendant told him that the defendant "was the man that done the killing;" and that the defendant handed him the notes to give to Richard Collins, then in the jail. As to this witness, the defendant introduced in evidence indictments and convictions for bad checks and for cheating and swindling.
As to alleged coercion in connection with the two written confessions and oral admissions by the accused in the presence of two deputy sheriffs and four other witnesses, exception is taken to the admission of each writing and excerpt of testimony relating thereto by the officers and the other witnesses. The first ground relates to testimony by the brother of the deceased, who the record shows gave the first testimony as to these matters. He stated, that, a few days after the defendant was in jail (beginning October 16), the officers brought him to the plant where the witness was working; *Page 693 
that "I talked to him at my plant, and he made the . . statement that he stood at the front gate while Richard Collins and Sam Kemp went to the back gate, and he said he stood at the front gate and watched when the man run out with the money box under his arm. . . I don't know whether he mentioned about the box under his arm that day, I don't believe the box and the color of the box was mentioned. He said he didn't know whether it was Richard Collins or Sam Kemp who went in the office and ran out, but he said they borrowed his gun. I would say that was in the latter part of October. I saw him in [the solicitor-general's] office several days later. . . When he came out there, he was in the car with [one officer]. I don't know whether [the other officer] was there, but I think [he] was in the car with them. They had that gun out there at that time. That was the gun the solicitor had this morning. [The defendant] said Richard and Sam Kemp came to his house the night before or that afternoon before, and said they were going to do a little trick, and they wanted him to go with them and they wanted to use his gun, and he loaned them that particular gun. I recognized that as the gun he had that day. . . I would think it was between the 15th and 25th of October when they brought him to my plant, I just don't remember exactly." The witness then testified as to his presence in the solicitor-general's office on the afternoon of November 2nd during the entire time, when all present talked to the defendant, and longhand notes were taken, which afterward were copied on a typewriter and signed; that "no one made any promises or implied any threats; I asked the boy that myself after he finished making his statement, I asked `Why have you confessed to this?' and I said, `Aren't you afraid of the consequences?' and he said, "My conscious hurt me and my conscious made me tell the truth;" that "no one held out any offer of reward to him; I asked him if the officers mistreated him in any way, and he said, `No, sir,' and I said, `Have they promised you anything?' and he said, `No, sir.'" The witness then testified as to what the defendant there said: "He said . . he was standing at the front gate of the oil plant, [and] he saw the man run out the office door and down the platform and jump on the ground, . . he had a box under his arm, and [the solicitor] asked him what size box, and he used his hands to measure and said it looked like about *Page 694 
this size and a little bit bigger than a shoe box, and I passed a note to [the solicitor], `What color was the box,' and before [the solicitor] had time to see it, my note, he asked what color was the box, and [the defendant] said, `The box was green.' He said he saw all of that from the front gate. . . I remember him making the statement that they met, some run one way and some another, and they met at the leather place . . and I don't know whose it is. I remember when he said when they all met there, none of them had the money box at that time."
The witness then testified that "the next time I talked to [the defendant, at the time or just preceding the second written confession, dated November 6], was between 11 and 12 o'clock one Saturday night," at the court-house where he went on a telephone call, and where a number of others were present, and they talked to the defendant "in the conference room upstairs;" that "no one offered him any reward, direct or indirect, to talk about it that night, not that I know of;" and that, "as to whether anybody threatened him, directly or indirectly, of any punishment, he didn't appear to have been excited; he was as calm as anybody I ever saw; in fact, at times he would even grin about it as the confession went along." To questions by the court, this witness answered: "On the last occasion to which I referred in my testimony [quoted next below], there was no offer of reward made to this man. As to whether there was fear of injury or suggestion, directly or indirect, made to this man, I didn't hear a cross word of any kind said to this boy in both confessions." As to the confession made that night, "he said he had not told the truth and that he wanted to tell the truth, and he went on to tell me word for word, and I questioned him as he went along. He said he did it all by himself, and I asked him was anybody else in with him, and he said `No,' and I asked him wasn't he afraid somebody would come in on him, and he said, `No, sir, I did it quick,' and I asked him just what happened when he went in the office, what my brother said, and he said when he went in he told him to throw up his hands, and I asked him did my brother do it, and he said `Yes,' and I said, `Why did you shoot him?' and he said, `He jumped up out of the chair,' and I said, `What was he doing?' and he said, `He was writing,' and I said, `Why did you shoot him?' and he said, `I don't know, sir.' He said when he *Page 695 
shot he grabbed the box and ran out the back way. He also said he went over the back fence and went on across the tracks. He also went into detail to tell how he entered the back, about locking Brinkley [a colored employee] up in the house. He said he put the gun on Brinkley and made him get in the house. He said he went across the tracks and throwed the money box down, and he went to a joint called Deans and he stayed there some little time and he went on home and went to bed. . . The room was about full of people. . . I would say that he was calm more than he was unconcerned. He didn't seem to be especially excited, and occasionally he would grin about it in the confession. As to whether it was a silly laugh, no, sir, I would not say so. I would say a smile or grin. I did not have trouble understanding what the defendant was saying; he talked rather slowly. I did not detect any stammer in his speech at all. He talked slow that night."
While much of the testimony from this witness as to the first statements of the defendant at the plant of the witness a few days after the defendant was first placed in jail, and as to the circumstances attending the last oral confessions, which were reduced to writing on November 6, was elicited by one of the attorneys for the defendant, exception is taken to the admission of the entire testimony relating to confessions. After questioning the witness, the court admitted the testimony, and at the same time cautioned the jury: "In determining the evidence of confession, whether coming from this witness or subsequent witnesses, the court instructs you, in order to make a confession admissible, it must have been freely and voluntarily made without being induced by another, by the slightest hope of benefit or the remotest fear of injury;" that "if you find a confession was freely and voluntarily made, it will be considered by the jury with all the other evidence in determining the guilt or innocence of the defendant;" but that "if, in the opinion of the jury, you believe the confession was not freely and voluntarily made, you will not consider it at all." In the final charge these rules were repeated, and in addition the jury were instructed: "In determining whether the statements relied upon by the State as confessions of guilt by the defendant were voluntary or not, you may consider the facts and circumstances surrounding the giving of the alleged statements, both oral and written. It is proper for you to consider the situation of the *Page 696 
parties in respect to whether the persons questioning him were persons in authority as officers of the law or of any court, their method of questioning, their persistence and length in questioning, and the place or places where the alleged questioning took place. . . It is proper for you to consider whether or not he was held in the jail incommunicado without being allowed to see and confer with his family or his attorney at law at the time he was being questioned."
Following the testimony of the brother of the deceased, the State introduced the evidence which has been referred to, the two written confessions; the four incriminatory notes, written at the jail by the defendant and delivered to a fellow-prisoner, Williams, for delivery to another prisoner, Collins; oral testimony by the girl who had testified that she saw a negro man running from the scene of the homicide at that time, as to the defendant having in her presence answered, "Yes, sir," in reply to a question asked him by the two deputy sheriffs near the scene, "if that is where he ran" when the homicide occurred; the testimony of the fellow-prisoner, Williams, as to confessions or incriminatory statements made to him; the testimony of the stenographer for the solicitor-general as to writing the oral confession made in her presence and embodied in the signed written confession of November 6, and its circumstances; the testimony of the assistant solicitor-general as to reading over to the defendant and his signature of this last confession, and the circumstances; and the testimony of the two deputy-sheriffs, Waldron and Stokes, as to their talks with the defendant preceding and attending the first oral confession made to them on October 21, following the surrender of the defendant at the jail on October 16, and as to the written and oral confessions made in their presence, and the circumstances. At the time of the admission of each item of evidence objection was made to its admissibility, and at the conclusion of the State's evidence and the conclusion of the defendant's evidence motions were made to exclude all evidence relating to confessions or incriminatory statements by the defendant, on the ground that all of such evidence "was a part of and grew out of and was the effect and result of the alleged confessions, and the improper and persistent questioning and conduct [by the two deputy-sheriffs], which forced the said alleged confessions." *Page 697 
The testimony of the deputies as to the statements made to them or in their presence, and the circumstances, were as follows. Deputy-sheriff Waldron testified: After the defendant gave himself up at the jail, the two deputies "talked to him a little while . . Monday night, October 16th. . . We did not talk to [him] about the Trice murder at first. He said he had heard we were looking for him about some trouble he had had, and we didn't say but very little that night. . . He mentioned some trouble that he had had with Mr. Garvin at the T T Packing Company. He said he heard there was a warrant and that Mr. Stokes and myself were looking for him." On the following Tuesday night "we talked to him I reckon about an hour, talking about the case, and he didn't know nothing about it then, and then on Wednesday night we went back and talked to him again, and he told us a little more about it. He started off that night telling about it. That night he said he had a pistol, the pistol belonged to him, and he said that there were three more, and he brought them into it. He and another negro watched the front at the place, and the other went to the back of the place, and he said he was standing at the front of the gate, him and Charlie Frazier, and the other two men went to the back. He said the other two were Sam Kemp and Richard Collins. He said he saw Sam get over the fence and come up the platform and he saw him shoot Mr. Trice and he saw him run out of the door, that was Mr. Trice, and fall in the yard, and said Sam Kemp come out of there with the green money box in his hand and run and jump off the platform at the back end of the place. He told us that on Wednesday night. That was on the 18th of October. Prior to his telling that, officer Stokes or I or any one else had not threatened him in any way whatsoever. Officer Stokes nor I or any one else had promised him anything, directly or indirectly. I did not talk rough to him. I talked just as nice as any one could talk. Mr. Stokes did not talk rough to him. If anybody at any time ever threatened him in any way, I don't know anything about it."
This witness swore that as to the written confession dated November 2 there was a conversation in the office of the solicitor-general. "No one suggested any punishment to him or any reward of any kind if he didn't talk about it, while I was there, and I was present the whole time . . during the whole conversation. *Page 698 
He seemed to be just as calm as he could be, as calm as I am now. He did not hesitate to answer any question that was asked him. He did not try to dodge any of them. I think Mr. McGee took down in writing what he said. I was present when it was read to him. That was read the next morning. Mr. Trice [brother of the deceased], was there. . . This is the statement that was read to him. He said that was so, at that time, he said that was all true. He signed it in my presence and in the presence of [the solicitor] and Mr. Stokes. Mr. Trice was not here the next morning. After that he changed his statement. That was on Saturday night of November 4th. The circumstances under which he changed the statement are as follows: We went up there on Saturday night. He sent for us to come up there, that he wanted to see us; so we went up there. I reckon it was 8 or 8:30 as well as I remember, and [the jailer] gave us the keys, and we took him to the little room where we always carry them, and he told us, he says: `My conscious is hurting me so bad, and I have tried to bring others into it, but they know nothing about it;' and he says, `You have got the right one that killed Mr. Trice,' and he said, `Send and get Mr. Trice [brother of the deceased] so I can tell him about it.' That was all that was said. I called Mr. Trice to come down there, that [the defendant] had a confession and wanted to tell how he done it. He told us how the killing happened. We asked him how he went in the place, and he said he left his home and come on Hammond Street until he got to Hazel, and he turned at the back of the plant up the railroad and went to the back of the filling-station, and he saw Mitchell Brinkley [an employee] was locking up the big oil tanks that they have got there, and he crawled over the fence at the gate at the platform, he goes over there, and there is four tanks this way and two this way, and he gets to the second one from the walkway, and Mitchell Brinkley was at the end next to the railroad near the fence, locking up, and he said he told Mitchell to go in that house and throw that wrench down, and he says, `I locked him in that oil house,' and he says, `I went up the platform to the place, and Mr. Trice was in the office doing some writing, and I told him to stick them up, and he turned and faced me and I shot him.' I asked [the defendant] why did he shoot Mr. Trice, and he said `because he knew me,' and he said, `I shot him and I got the money out of the drawer.' And the next morning *Page 699 
[the defendant] took me out there and showed me the way he went. He told me and Mr. Trice and all of them what he done with the pistol; he told us where it was at. . . I think we got the pistol the day that the statement was made. The pistol was over there where he lived at. He told us that the pistol he had it put in the bed mattress, and Mr. Stokes and myself carried [the defendant] with us, and there was some clothes on the bed, and I asked [the foster mother of the defendant] to take the clothes off the bed, and she said, `There ain't no need to.' . . [The defendant] was standing at the bed. I told her, I said, `I am looking for the pistol,' and she said, `I have taken the pistol out of the bed mattress and put it in the closet,' and there was some clothes in the closet, and she run her hand up that bag, a laundry bag, and got the pistol out of some of those clothes. I don't know whether it was the coat or trousers, and that pistol was taken out and handed to us. This is the pistol, single action, Smith and Wesson, Number 19757. He said it was his pistol. . . I believe we did take him by the plant on the way back. I spoke to Mr. Trice. That was about the time he made the statement in your office. When he was talking to us in jail that Saturday night, after that he told us what he did with the money. He said he taken the money home that night, the biggest portion, and buried it under the house in the chimney corner. . . He told us there was a hole in there. . . It was about as big as a half gallon bucket. I went out there about 11:30 that night. . . I went under the house that night. One side was all right, and the other side was just like he said. He told us it would be full of dirt and we would find a soft place under the chimney. We didn't ask him which side to look under. As to whether it was just the size as he had said, it was about that big and about that deep. That was the way he described it to us. . . About November 4th or 5th, he told us that night he would love to go out there and show us how he went in there and how he done everything, and all about it. We told him we would take him out there. Mr. Stokes went with me. We went that Sunday morning about 10:30, I reckon, following that conversation Saturday night. That Saturday was following this confession on Tuesday."
The witness referred to a coal yard beginning at a railroadtrack. "He told us to stop, and we stopped the car along about *Page 700 
here, and he said to me, `Mr. Waldron, you see that telephone pole,' he said, `There is a path on one or the other side of that pole,' but he says, `I went that path that night.' . . We didn't ask him a thing; he was going to show us which way to go, and he said, `Turn here, that is a side-track,' and we got right here, as well as I remember there was a tank car here, and he got out of the car and said, `Right here is the platform is where I got over the gate and come around here to this tank, and that boy Mitchell was at this tank. You have to climb up to get over that platform from the outside. At the time I took him down there he said that gate had been put there and there had been several strands of wire put over that, . . and he said that night Mitchell Brinkley was at this tank here, and he said he told him to throw that wrench down and get in that oil house. He put him in there. There is a little runway that goes out of these tanks where they get up there to lock the tanks, and he said, `Them steps were not here that night, they had been put there since.' He said he got up on the platform here, and Mr. Trice was right here at his desk, and he said he walked in the door and told him to stick them up, and he said Mr. Trice got up and turned on him face to face, and he said, `I shot him because he knew me.' He said he got the money box out of the desk and Mr. Trice went and jumped off the platform and fell, and he said, `There is a fence that goes toward the tracks,' and he said, `I got over right here.' . . And he said, `I will show you as near as I can where I went,' and he come to the end of the tracks, and he said, `I come right across here to this path to this pole and on across here,' and he says, `Right along here I lost or throwed some of the papers down at the mouth of Gantt's alley,' and he says, `I come up here until I got to this house, and I went between those houses and I separated the money from the checks between those houses.' He said he went through here and threw the money box at the corner of this house, which is on the corner of Gantt's alley and Bright's alley, and he said he went on out and come out in front of Booth's cafe on Broadway and from there to Mr. Dean's, and he said he got home about 11:30 that night. I went to his home with him. . . I asked him that morning which side of the chimney did he bury the money on, and he said, `The upper side where we lived,' the side next to Schofield's. That is where the hole was. In all of this conversation *Page 701 
he talked freely and voluntarily with me." As to the incriminatory statements in the notes written at the jail, this witness said: "I showed those notes to [the defendant]. He said he wrote them. Richard [Collins, to whom they had been delivered, or who knew as to their contents] was present. We had that conversation in the same little room in the back of the jail next to the kitchen . . Richard wanted to jump on him. He said he knew nothing about that thing, that [the defendant] had no business writing them." As to the last written confession, dated November 6, this witness said: "Following that conversation I had in the jail that Saturday night, I had Miss Lucy B. Reddy to take down what [the defendant] had said. That was on Monday morning. I was present when Mr. R. H. Casson [assistant solicitor of the city court] read that to him carefully. Mr. Casson asked him if anything was wrong, and he said, `No, sir, that is just like it was.' He said there was nothing wrong. He signed that after Mr. Casson read it to him."
On cross-examination, the witness reiterated much of his preceding testimony as to the confessions and statements by the defendant and the attendant circumstances. The witness swore: The defendant "was . . in a private cell. His flap was not locked back then; it never was locked that I know of. They have got a little thing on them that you can lock. The flap was pushed to. It has got a little spring that you can pull it back from the outside and open it. So far as he is concerned he is locked back if he was on the inside. As to whether every time I saw him from 10:30 on October 16th until his lawyers came into this case it was in that same shape, no, sir, I have been up there lots of times, and it would be open. I am sure that was before the lawyers came into this case. . . I think Willie was held incommunicado, so nobody could come to see him, his mother or sister or anybody, until after he confessed. There were several people talking to him. I mean until after the second confession. Some people did see him besides me and Mr. Stokes, and some other officers from October 15th, until the newspapers carried his picture and our picture and Mr. Stokes' picture and the gun's picture. . . I have been up there several times, and the flap would be open. . . We left instructions not to let anybody talk with him . . until after" the last confession was signed on November 6, 1939. As *Page 702 
to a reward, he said: "I know that the $1,000 reward was outstanding at the time Mr. Stokes and I got to working on the case. . . We are partners; and whatever we do, if there are four of us we split four ways, and if there are two we split two ways. As to whether I plan to share that reward if there is a conviction, it is customary. It would be divided between Mr. Stokes and me." Deputy Waldron further swore: "He signed that last paper in the daytime. He signed it on Monday. The statement he made orally was about 11:30 Saturday night. We called Mr. Trice [brother of the deceased] to come to the jail that Saturday night. . . As well as I can remember, it was 9 or 9:30 that I called Mr. Trice to come down to the jail; it may have been before that. We didn't talk to [the defendant] five minutes that night before he told us what he wanted to tell us. . . We didn't talk but five minutes, and he just told everything like it was, and said there was nobody in it, and asked did I call Mr. Trice. . . I reckon it was about 11:30 when we left the sheriff's office, Mr. Trice, Mr. Stokes, and myself, going to [the defendant's] house, going to look where he buried the money. We looked at the hole under the chimney the same night; we done like he asked us to do. . . I am not positive about what time. . . We didn't talk to him but about five minutes. . . I didn't talk to him on the morning of October 16. . . The next time I saw him was that night. I talked with him that night just a short time, I don't imagine over thirty minutes. Mr. Stokes was with me. . . About 8 o'clock that night Mr. Stokes and I went up there. We talked with him about an hour. We had him in the conference room [about six by eight feet, with a table in the middle, one door, one window, and sometimes one, two, four, or five chairs, located in the jail on the fifth floor of the court-house]. . . I guess we were in there about an hour; it may have been more. . . He asked us what did we want with him, and I said, `You ought to know,' and he said, `About Mr. Garvin and the T T,' and he says, `I heard you had a warrant for me, and I come down and give up to Captain Tom Sunday night,' and I told him I didn't know whether there was a warrant for him or not for Mr. Garvin, and we asked him where he had been, and he told us. . . He told us he had been to Mayfield and Valdosta and Lizella. . . I asked him something about this Trice business, and he said he *Page 703 
didn't know anything about it at all. He said he didn't know anything about it at all. He said he didn't know when he heard about it, but he said he went to bed that night about 6 o'clock, the night Mr. Trice was killed. . . He said he heard the shooting about 11 o'clock the night Mr. Trice was killed. I said to him, `Don't you know Mr. Trice was killed before that time of night?' and he said, `I heard the shooting about that time.'"
On this occasion the defendant denied having had any connection with the homicide; the witness did not tell the defendant "it would be better for him to go on and tell [the officer] that he did it. On the first night this occurred the other officer, Stokes, said to the defendant "about the same thing I did, as well as I remember." "The parting words were, `Willie, whenever you want us, you send for us,' and he sent for us. I don't know what day it was, some day or two after that, and he told us about Charlie Frazier and Sam Kemp and him sitting on the porch that afternoon." They were with the defendant as long as an hour, but the witness would not say it was two hours; he did not tell the defendant as to leaving instructions not to let anybody see him; the witness did not talk to the defendant "Tuesday morning, and I was off Tuesday night. I don't think I saw him on Tuesday, October 17," but saw him Wednesday night. The witness was mistaken as to getting the call to the jail on Wednesday or Thursday. "I went back and checked up on this thing this morning. . . It was the 21st when we got the call on Saturday morning. . . My understanding is that somebody else did talk to him besides me and Stokes; what it was about, I don't know. That was contrary to our orders. Mr. Stokes and I saw him on Wednesday, October 18, that night about 8 or 8:30 o'clock. I talked with him about an hour, may be not that long — probably 8 to 9 o'clock. I did not see him any more after 9 o'clock that night. He had not gone to bed the first night I talked with him, Monday night. He had not gone to bed on this Wednesday night. On Wednesday night we questioned him some about this case, and he didn't know anything about it, could not tell us anything about it. We questioned him pretty heavy. As to what we said, we asked him about the case, and he didn't know anything about it. . . We questioned him like a person would for, I suppose, about an hour. . . We asked him did he know anything about the Trice *Page 704 
killing and was he connected with it in any way." The defendant told them "No." As to why they did not want to leave the defendant alone, "we didn't want to leave him alone."
As to questioning the defendant Wednesday night heavily for an hour, "It might have been an hour or it may have been more." "Q. You questioned him heavily? A. About like you are questioning me. Q. Did you go after him vigorously? A. I never spoke a harm word to him in my life. Q. You stayed on the subject like I am staying on it with you? Yes, sir. . . Q. You propounded one question after another? A. Yes, sir, and what he told us was the same thing every time. Q. The same thing was he knew nothing about it? A. Yes, sir. Q. He said he was home in bed at 6 o'clock that night? A. Yes, sir. . . Q. Did he give you the same answer every time? A. For six or eight times until he told us about him and Sam Kemp and Charlie Frazier and Richard Collins. Q. For six or eight interviews he denied knowing anything about it? A. I would not say it was that many; it might have been less. . . It could have been more or less. Q. When you say six or eight times, you mean nights? A. We saw him some in the daytime. The most of the time we had to work on the case was at night. . . To the best of my recollection he denied it for six or eight interviews. . . We talked to him so many times at night, and in the day when we had a chance we talked to him, but most of it was at night. There are nights that Mr. Stokes went to him that I didn't go." The witness did not recall as to whether he talked to the defendant Thursday, October 19. "The night of October 15th on Sunday was when he gave himself up to Captain Tom; and Saturday, November 4, he told us himself the last statement that nobody was in the killing but him and him alone. . . We talked to him so many nights, I can't tell you what nights." The witness could not estimate how many nights he missed. "I know I talked to him a lots, some days we would talk to him, we would have a few minutes when we would come from school, and may be he would send for us, and lots of times he would send for us and we could not go up there." It was Saturday in the daytime when the witness was called to the jail, after the defendant sent for him; and the defendant then said: "I want to tell you about this thing." . . He said he wanted to tell the truth and get through *Page 705 
with it, and he wanted to go before the judge and plead guilty. That is pretty much the same statement, as well as I remember, as the one he made on November 2nd. I asked him what sort of box was it, and he said it was a green money box. I know that common sense would teach anybody that a man could not stand 100 or 150 feet away and tell what kind of box it was." This was the reason they did not believe the first account of the homicide as stated by the defendant; and on Saturday night, November 4, when they talked to the defendant, the witness said to him: "Willie, I want to know one thing; you can say yes or no: Are your eyes all that good to tell what sort of box that was from the gate where you were to the place where it was; could you tell whether it was green, blue, black, or brown; do you mean to tell me you could know the color of that box, you could see it from that gate?" "He turned and looked at Mr. Stokes, and he turned back to me and said, `Mr. Waldron, you don't have to go no further; you have got the negro that killed Mr. Trice,' and I said, `What did you kill him for?' and he said, `I don't know, I wanted some money,' and he said, `I would love you to call Mr. Trice. I want him to come down here and let me tell him how it happened.' . . I said, `Do you mean to tell me that Richard Collins and Charlie Frazier and Sam Kemp is not connected with it?' He said, `None whatsoever,' and he said, `I am the one that killed Mr. Trice,' and he said, `I don't give a damn what anybody says; you can send the gun to anybody in the United States, but I know that is the gun that killed Mr. Trice.' And he said, `I bought it and give six or seven dollars for it myself. I know my gun, and I know what I done with it." Witness testified, that the defendant said he had worked for the deceased, and the deceased had paid him; that on the next day, Sunday, November 5, they went with the defendant out to the plant where the homicide was committed, and Mr. Trice, the brother of the deceased, was out there; that during this trip the defendant told a negro woman that he had given her $35; that at the request of the defendant for a coca-cola the witness bought one for him, and he asked "for a nickel or dime to get some tobacco with, . . smoking tobacco and crackers with," and the witness had given him such money before and after he signed the confession, and "four pennies" when the defendant "asked him for some money to gamble on, and he wanted *Page 706 
nickels. . . I imagine fifty cents would cover it all, a nickel or dime at a time." He had given the defendant a cigarette. As to the last written confession which was taken down and transcribed by Miss Lucy Reddy, he testified that she "is an employee of the county;" that Mr. Casson, assistant solicitor of the city court, "read it, and he said, `Willie, if there is anything that don't sound right to you, you say so, you stop me,' and he would read a line and he would ask Willie if it was right; and when he got through, Willie said it was all right, it was true."
In the cross-examination by defendant's counsel as to the questioning by the officers previously to the written confessions, there was the following additional testimony by this witness: "Q. Why didn't you take him to the solicitor's office that Saturday night, I mean the 21st, and get the statement reduced to writing? A. I was not ready. Q. Why were you not ready? A. I wanted to question him further and question him until I got what I wanted. Q. What did you want? A. You know what I wanted. Q. You wanted a confession? A. I got it. Q. Do you want the $1000 reward too? A. I will tell you and everybody. I figure that, a thing like this happening, it is my just and honest duty to solve it if I can, regardless of money or rewards. I lived a long time before this, and I can live right on. I only tried to do my duty. Q. Didn't you have a confession on the 21st when he told you? A. I didn't believe it. Q. Why? A. I knew his eyes were not that keen to detect the color of that money box 150 feet away. . . It is true, whether I said it or not, that we questioned him heavily for three weeks. We grilled him for three weeks, just like you are doing me; just like a lawyer who is doing the best he can in examining a witness. . . I will say that all these statements were freely and voluntarily given. There was no cross words, no threats, nothing promised him, nobody has punished him. I told you I reckon I gave him a half dollar all told. As to whether he told me I need not go any further, he says, `I am the man that killed Mr. Trice.'" As to the gifts for tobacco, four pennies for gambling, the coca-cola and cigarette, there was no testimony and nothing in the defendant's statement to the jury to indicate that they had any connection with the making of any confession or incriminatory statement by the defendant as a reward or inducement. *Page 707 
The deputy-sheriff, Stokes, gave testimony similar to that of Waldron. He testified that "we knocked off at 10 o'clock and went home, and we never did stay down here until Saturday night any later than 10 o'clock. I never talked to him later than 10 o'clock, except on Saturday night [October 21] that he confessed." On that night "he brought in the other three men. . . I told him I knew he killed Mr. Trice. I told him if he done it we would find out. As to how I expected to find out, I was expecting him to tell it. As to whether I was expecting to stay with him until he did tell me, I was expecting to stay with him for a while. . . I was pretty sure I had the right man, and I was going to stay with him and make him confess. I was going ahead and talk to him. I was going to stay with him until he did admit it of his own free will. As to how long I was going to stay with him, we were going to keep him until we were satisfied that he didn't have anything to do with it. You can tell from the way a woman or man talks whether he is innocent or guilty. . . I kept telling him over and over that he killed Mr. Trice, and he said he did not. As to whether I told him he might as well come clean with it, I told him we would find out sooner or later. I did not tell him he might as well admit it. As to whether I told him it would be better if he told the truth, I told him we wanted the truth. I did not tell him the court would be lighter on him if he told the truth. . . As to whether he told us at one sitting this two-page statement that is written down and dated November 2, he told us that story in there on November 2, when we brought him down and talked to him, and [the solicitor-general] sat there in his office with Mr. Trice and myself and Mr. Waldron. He had been telling us piece by piece for two weeks before that. Mr. Waldron and I had not been suggesting things to him by our questioning. As to whether we asked him leading questions like you are asking me, yes, sir, we asked him questions. I did not ask him questions that he would know what I thought the answer would be. I told him I thought he killed Mr. Trice. I asked him to tell the truth. I did not tell him what the truth was. . . I never told him he had better tell the truth. . ." Q. "If you had not locked him up and locked back the flap, and if you had not left instructions that when he wanted you to call him, you don't think he would have made a voluntary confession, do you?" *Page 708 
A. "If there had not been nothing at all said, he might not." While this witness testified that he had given nickels or dimes to the defendant when he asked for money for tobacco, and the witness thought he had let the defendant have thirty-five cents for gambling, and the witness gave the defendant money for tobacco in the week preceding the trial in February, 1940, there was no testimony and nothing in the defendant's statement to the jury to indicate that such gifts had any connection with the making of any confession or incriminatory statement by the defendant.
Miss Lucy Reddy testified, that she worked for the solicitors of the superior court and the city court as an employee of the county, and took a statement from the defendant at the court-house, in the little conference room in the jail, on the left as you go in, on Monday, November 6, and that the confession shown her was the one she took; that the defendant's manner was very calm. "He was calmer than I am. . . Sometimes he would not look my way, he would look towards the door. He wasn't looking at Mr. Stokes or Mr. Waldron. He was looking towards the door. He wasn't right next to the window. . . The window faces the street out here. The door would be up here where I am; and table would be in between. I was sitting to the left." The defendant "was right across from me. . . Mr. Stokes was kind of behind me and in a chair kind of pushed back towards the window, and Mr. Waldron was right next to him in the window. . . No one was present at the time this statement was written, except Mr. Stokes, Mr. Waldron, the defendant, and me. . . Mr. Waldron spoke first. . . He said, `Willie, you said you wanted to tell us what happened and don't leave out nothing.' He did not ask him if he still wanted to tell it. . . He made this statement without more than a couple of interruptions. These interruptions were, I think, twice Mr. Stokes asked him what he said when he said he spent a right smart of money, and Mr. Stokes said, `Give us some idea of how much you spent.' And I put down accurately what the defendant replied: three or four hundred dollars in Mayfield and three or four hundred dollars in Valdosta. . . No one told him that his constitutional rights were such as he did not have to say a word. At the end they asked him if it was freely and voluntarily made, and if they had promised him anything and it was freely and voluntarily *Page 709 
made. That was after it was all over except the signing. What I did put down there is this: `This statement is made freely and voluntarily. Nobody has promised me anything or made any threats against me. I have made this statement of my own free will and accord.' Nobody advised him that he didn't have to make it if he didn't want to. He was confessing murder, and he was calmer than I am now. He smiled occasionally as he made this statement. He laughed one time when he said he spent it on beer, whisky, ice-cream, and women."
R. H. Casson, assistant solicitor of the city court, testified that on Monday, November 6, he read to the defendant in jail the statement which purported to have been written by Miss Lucy Reddy, and told the defendant "if anything was wrong, I wanted him to stop and tell me; and I read it phrase by phrase, and I asked him if that was true, and he readily agreed that it was; and when I got through, I asked him if anybody had mistreated him, and he said, `No, sir,' and I asked him if anybody had promised him anything, and he looked surprised when I asked him that question. He made no statement to me why he made the statement. I gave him the pen myself, and asked if he wanted to sign it. . . The defendant . . did not make a single change in this statement. He didn't make any suggestion. . . I asked him after every phrase if this was true or `Did you say this,' and he always said `Yes' every time. . . I told him that he didn't have to sign anything, and I asked him did he want to sign a confession, and he said, `Yes, sir,' and I gave him the pen, and he signed it. . . I was surprised at his calmness. No, sir, he didn't smile. The officers didn't say anything when the paper was being read over to him. They didn't give him a nickel, they didn't give him a dime. . . As to what was said when the officers left him, we went out of the door and turned to the left, and he was walking ahead of the officers, and he said something about a cigarette, and I reached for mine, and one of the officers gave him a cigarette."
As to the mentality of the defendant in so far as it might affect the question whether his confessions and incriminatory statements were voluntary, the testimony was in conflict. While witnesses testified for the defendant that his mental age was between seven and eight years, that his intelligence was low and he was unable to distinguish between right and wrong, other witnesses for the *Page 710 
State testified to the contrary; and that they had known the defendant for a long time, and notwithstanding a lack of mental alertness and initiative he came up to the average person of his race who had like shiftless habits and indolence.
As to the divisions of the syllabus numbered 1, 11, 12, 13, and 14, some elaboration appears to be appropriate.
1 (a, b). Inasmuch as the pressure of the case appears to devolve largely upon the question as to whether the original confessions made by the defendant to officers were obtained by coercion, and therefore should have been excluded on objection at the time of their admission, or should have been ruled out on subsequent motion, with the result that other subsequent confessions and incriminatory statements should also have been excluded on the theory that the previous undue influences still operated on the mind of the defendant so as to have caused these later confessions and statements, otherwise wholly unexceptionable, we have thought it proper to embody in this decision a comprehensive summary of all the voluminous testimony bearing on these questions. We have thus sought to include in the statement of facts every portion of the testimony relating to such contentions of counsel for the defendant in their presentation of the case to this court. In so doing, a large part of the testimony of these officers, both as to what the defendant said and the circumstances of his statements, has been incorporated. This was necessary for the reason that the circumstances are so intermingled with the statements that the only method of presenting the circumstances is to include much of the officers' testimony in its entirety. The principles in the syllabus seem well supported by authority — that before a confession or incriminating statement is admissible in evidence, a prima facie showing as to its voluntary character must be made; and if this preliminary proof fails to make such a showing, the confession or statement must be excluded (McLemore v. State,181 Ga. 462, 182 S.E. 618, 102 A.L.R. 634, 643, notes; 38 A.L.R. 120); that after such proper preliminary proof the confession or statement *Page 711 
becomes admissible, but the defendant may by evidence attack its voluntary character, and in that event the question as to voluntariness is for the jury (Bradberry v. State, 170 Ga. 859
(4), 865, 866, 154 S.E. 344; Price v. State, 144 Ga. 855
(3, 4), 40 S.E. 1015; Carr v. State, 84 Ga. 250, 255,10 S.E. 626; Thomas v. State, 84 Ga. 613 (3, 5), 619,10 S.E. 1016; Irby v. State, 95 Ga. 467 (2), 20 S.E. 218;Claybourn v. State, 190 Ga. 861, 866, 11 S.E.2d 23); that where the voluntary character of a confession is made to appear by unequivocal evidence, the mere existence of attendant facts and circumstances, as shown on cross-examination of the witnesses, which do not directly or necessarily dispute the prima facie showing, will not require exclusion of the confession from evidence, but the question as to its voluntary character should properly be left to the jury (Cantrell v. State, 141 Ga. 98
(4), 80 S.E. 649; Bradberry v. State, supra); and that ordinarily the question as to whether confessions and incriminatory statements, unexceptionable in themselves, were made under previous undue influences still operating on the mind of a defendant, is not a question of law for the court, to be resolved by excluding such evidence, but is a question of fact for the jury. Pines v. State, 21 Ga. 227; Valentine v.State, 77 Ga. 470 (3), 480; Milner v. State, 124 Ga. 86
(52 S.E. 302); Jackson v. State, 172 Ga. 575 (2, a, b), 587 (158 S.E. 289).
In all jurisdictions where the duty is placed on the State to show the voluntary character of a confession, it seems to be the rule that, in deciding whether a sufficient prima facie showing has been made to authorize the admission of the confession, the judge "is vested with a considerable measure of discretion, which discretion, however, should be exercised with great care, to the end that the due and proper enforcement of the law on the one hand is not impeded, and that no injustice is done [the] accused on the other." 22 C. J. S. 1469, § 838, and cit. The court "must determine the weight of the circumstances relied upon to admit or exclude the confession in the particular case." 20 Am. Jur. 457, § 537, and cit. Thus, in Hopt v. Utah, 110 U.S. 574 (4), 583,4 Sup. Ct. 202, 28 L. ed. 262), the United States Supreme Court said: "The admissibility of such evidence so largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. *Page 712 
As the question is necessarily addressed, in the first instance, to the judge, and since his discretion must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion." In that case the confession to the witness, a detective, was held properly admitted upon his testimony that, so far as he knew, "the confession was voluntary and uninfluenced by hopes of reward or fear of punishment; he held out no inducement, and did not know of any inducement being held out to defendant to confess;" even though the testimony of the witness as to the attendant circumstances also showed that when he made the arrest, the father of the deceased "may have made a motion to draw a revolver on the defendant," and the witness "may have prevented him from drawing a weapon, and thinks he told him to do nothing rash;" that "at the arrest a large crowd gathered around the defendant; [the witness] hurried him off to the jail, sending with him a policeman, while he remained behind, out of the hearing of the policeman and the defendant;" that "in two or three minutes [the witness] joined them, and immediately the accused commenced making a confession;" and even though the witness did not know "what conversation, if any, occurred between [the defendant] and the policeman during the . . two or three minutes preceding the confession;" and the prosecution did not call the policeman as a witness. In McLemore v. State, supra, the State's witness testified that he did not know whether he told the defendant that "it would be better for him to go on and tell the truth . . it would be better for him to make a confession . . it would be better to tell the whole story, to come clean . . [and] it would be better for him just to make a full disclosure;" and the evidence of a confession was excluded on the failure of the State to make a prima facie showing, since this testimony itself failed to make the required showing that the accused was not influenced by hope of benefit or fear of injury.
Where undue statements to a defendant thus clearly appear on across-examination of the State's witnesses, it is the duty of the court to exclude the confession or criminating admission made by reason of such statements. Green v. State, 88 Ga. 516,519 (15 S.E. 10, 30 Am. St. R. 167). A like rule has been applied where the evidence as to the facts and circumstances of the confession demanded *Page 713 
the finding that the confession was not made voluntarily.Thomas v. State, 169 Ga. 182, 184 (149 S.E. 871). It was there said (two Justices dissenting): "Under the facts of this case the evidence as to confession should not be admitted, and left to the jury to say whether it was voluntary, in pursuance of the general rule expressed in [Griner v. State, 121 Ga. 614
(6)], because the evidence of the sheriff, giving the testimony as to the confession, in substance admitting that the defendant had been taken from his custody `and carried to the swamp' by a mob the night before the confession was made, demands a finding
that the confession was not made voluntarily and without being induced by another by the slightest hope of benefit or remotest fear of injury." (Italics ours.) There are similar rulings by the United States Supreme Court. In Ziang Sung Wan v. U.S., 266 U.S. 1,3, 15 (45 Sup. Ct. 1, 69 L. ed. 131), the accused was a sick man, very weak, exhausted; and emaciated. One or more police officers remained constantly in his room; another guard was outside the closed door. The accused was "subjected to persistent, lengthy, and repeated cross-examination," even after midnight, "sometimes . . subtle, sometimes severe," always "conducted with a view of entrapping [him] into a confession. . . On the eighth day the accusatory questioning took a more excruciating form . . continuously for ten hours, this sick man was led from floor to floor to examine and re-examine the scene of the triple murder and every object connected with it, to give explanations, and to answer questions," as to "the places where the dead men were discovered;" and the accused was shown the revolver supposed to have been used, with bloodstains thereon, and on the floor and stairs, the clothes of the murdered men, a bloody handkerchief, and their photographs as they lay dead. This interrogation, which "passed at times from inquiry into command," continued from 7 at night till 5 in the morning, with "not a moment of sleep . . allowed" to the accused. The questioning was then resumed in twenty minutes, and continued four more days. Under these circumstances of manifest coercion, the court held that the testimony "left no room for a contention that the statements of the defendant were in fact voluntary;" and that "the undisputed facts showed that compulsion was applied," as to which "there was no issue upon which the jury could properly have been required or permitted to pass." (Italics ours.) *Page 714 
In Bram v. U.S., 168 U.S. 532, 539, 561 (18 Sup. Ct. 183,42 L. ed. 568), it appeared that, after a murder had been committed on the high seas, the accused was put in irons and the vessel brought to a port, where the witness to whom the confession was made had the accused brought "as a prisoner to his private office, and there proceeded to take extraordinaryliberties with him; he stripped him;" and the accused "obeyed every order and direction that the witness gave." The United States Supreme Court there held, that where the testimony of this officer showed an incriminatory statement by the accused, attended by the circumstances stated and "whilst the detective was in the act of so stripping him, or after he was denuded," the statement was not voluntary. As to other cases of manifest coercion, see White v. Texas, 309 U.S. 560 (60 Sup. Ct. 688,84 L. ed. 947); Chambers v. Florida, 309 U.S. 22760 Sup. Ct. 472, 84 L. ed. 716). However, the exercise of a sound discretion by the court in admitting a confession, after a prima facie showing of its voluntary character, is not precluded by testimony as to additional facts, merely that the accused was in custody or under arrest at the time the confession was made (Hilburn v.State, 121 Ga. 344, 49 S.E. 318); or because the confession was "made at night, in the woods, while the accused was handcuffed, and in the presence of a deputy sheriff and a detective, and while being transferred from one jail to another at the instance of his father" (Simmons v. State, 181 Ga. 761
(4, 5), 764, 765, 184 S.E. 291; Wilburn v. State,141 Ga. 510 (5, a), 81 S.E. 444); or by the fact that in questioning the accused the officers may have told him that "he was lying and that they knew of his guilt," and he may have been "carried from place to place without authority of law, and . . for some days he saw neither relatives nor an attorney" (Claybourn v. State, supra); or that the accused was persistently questioned without the privilege of counsel.Douberly v. State, 184 Ga. 573 (2), 192 S.E. 223; 22 C. J. S. 1434. § 817. In all such cases the mere existence of one or more of those facts will not divest the trial court of discretion to admit the confession or incriminatory statement in evidence, and submit to the jury the question as to whether it was voluntary, unless the circumstances were so unusual that they must be said to show as a matter of law that such confession or statement was not voluntary. *Page 715 
In the present case — as to the confessions made to theofficers — on the direct examination of these witnesses, the prima facie showing of the State as to the voluntary character of the statements made to them was sufficient. On cross-examination nothing was developed in direct conflict with their testimony to that effect. However, the defendant contends that the facts and circumstances developed on cross-examination show the confessions to have been involuntary, because of the confinement of the defendant in jail, the denial of communication with his relatives or an attorney, and the manner of questioning the defendant during parts of six days before he made his first oral confession to the officers. Upon an examination of the officers' testimony, which appears in the statement of facts, and under the preceding rules, it can not be held that the judge erred in admitting the testimony of the officers, where he submitted fully and fairly to the jury the issue of voluntariness. The testimony as to the manner of questioning in no wise shows such a case as appears in any of the decisions by the United States Supreme Court or this court where the confession was held inadmissible. While the examinations of the defendant continued for parts of six days before he made his first oral confession to the two deputy sheriffs, and were mostly at night when they had no other duties, the conversations were unattended by any harsh treatment, threats or menaces, acts or conduct, and were in no case prolonged over an hour or so except on the night of the first confession, preceding which the defendant himself sent for the officers, began the confession within five minutes after the conversation started, and later also sent for the brother of the deceased, in whose presence he continued the confession apparently without any need of protracted questioning. There was some testimony by the officers on cross-examination as to having given nickels or dimes to the defendant for smoking tobacco, "four pennies" or other small amounts "to gamble on" at the jail, a coca-cola, and a cigarette. These acts, at the request of the defendant and mostly in the presence of other witnesses, can not be conceived as indicative of any attempt to bribe a confession; but they indicate the absence of any threatening or unkindly attitude on the part of the officers. While the officers were cross-examined at length as to their expectation of a reward, and as to what they intended and expected in obtaining the confessions, and what the defendant *Page 716 might or might not have done if he had not been confined or questioned, such testimony as to their private motives, expectations, or speculative opinions has no bearing on the crux for determination, except as it might be taken to throw indirect light on what was actually said and done to the defendant. As to the written confessions of November 2 and 6, and accompanying oral confessions, which were made considerably after the first oral confession of October 21 to the officers, and the voluntary character of which last confessions was prima facie shown by other witnesses, including the assistant solicitor and the stenographer of the solicitors, this evidence was plainly admissible under the rule in par. 1 (b) of the syllabus, and was properly left to the jury under full and fair instructions to determine as to its voluntary character. For the same reason, the testimony of the brother of the deceased as to a subsequent confession made to him at the plant of the homicide, and as to other oral confessions made in the presence of this witness, the officers, and others, was admissible under the prima facie showing made by his clear and positive testimony. The incriminatory notes written by the defendant to a fellow-prisoner and an oral confession made to another fellow-prisoner were admissible, although the times when they were written or made with relation to the examinations by the officers are not clear from the evidence, since these incriminating statements and confession appear to have been written or made on the initiative of the defendant himself, without any testimony that they resulted from anything that the officers said or did. In any event, it was for the jury to say whether such notes and confession were voluntary.
(c) The constitutional contentions of the defendant are based on two recent United States Supreme Court decisions, above cited, White v. Texas and Chambers v. Florida. See also Norris v. Alabama, 294 U.S. 587 (55 Sup. Ct. 579,79 L. ed. 1074). As indicated in the syllabus, while we recognize fully the right and duty both of this court and the United States Supreme Court, in a case where an alleged coerced confession or other violation of due process is involved and the question has been properly raised, to examine the record to determine from the facts whether there was such an infringement, and while we recognize that the findings of a jury are not of such finality as to deprive the reviewing courts of jurisdiction to decide for themselves what the evidence shows, *Page 717 
nevertheless, as was said in Claybourn v. State, supra, "We do not construe the . . language [in the Chambers decision] to mean or imply that the Supreme Court can or will invade the province of the jury and usurp the function of the jury to decide issues of fact." From an examination of the United States Supreme Court decisions it appears that while the question of coercion or other violation of due process was there contended to be in issue and the facts to be in controversy, yet no issue actuallyexisted, either because of the facts themselves under undisputed testimony, or because the only rational inference (even though the evidence was in technical dispute) was the one conclusion that the confession was obtained by coercion, or that due process had otherwise been violated.
11. Under our system of jurisprudence, the functions of witnesses, the jury, and the court are distinct and defined. This may not be so apparent under the Roman law, where mere opinion evidence on ultimate questions of fact may have been permissible. Under our Code, a defendant who seeks to avail himself of the defense of insanity at the time of an offense must show that he was then an idiot, or that he was a lunatic or afflicted with insanity, without a lucid interval at the time of the offense. §§ 26-301, 26-303, 26-304. The test of criminal responsibility in all cases is whether the accused could distinguish between right and wrong with respect to the particular act, with the one recognized exception that, although "a man has reason sufficient to distinguish between right and wrong, . . yet [if] in consequence of some delusion the will is overmastered and there is no criminal intent," he is not responsible, "provided that the act itself is connected with the peculiar delusion under which the prisoner is laboring." Rozier v. State, 185 Ga. 317,320 (195 S.E. 172), and cit. The ultimate fact to be determined by the jury under instructions from the court is responsibility. Upon this question the opinion of neither an expert nor a non-expert witness is permissible. It has been held that a witness, stating the facts on which his opinion is based, if a non-expert, or showing familiarity with the defendant's mind, if an expert, may state his opinion as to whether the defendant had "sufficient mind to know the difference between right and wrong."Hinson v. State, 152 Ga. 243 (3, a) (109 S.E. 661). As is said in 4 Wigmore on Evidence (2d ed.), 176, § 1958 (2): "The *Page 718 
capacity of an accused person to be legally responsible for the crime charged depends also upon a legal definition; and it would therefore be equally improper to ask for the witness's testimony without first eliminating the element of law from the question. But an inquiry whether he knew the difference between right and wrong, or whether his will could control his actions, would be proper." The same writer, however (p. 131, § 1937), draws a distinction between an opinion as to sanity and an opinion as to "criminal capacity" or responsibility; "the latter sort of opinion [being] inadmissible . . because a question of law may be involved, and witnesses' conclusions are not needed on such points." A similar rule has been stated in 3 Chamberlayne on Evidence, 168, § 2012, as follows: "The attending physician must confine himself to medical inferences. He is not warranted in judging of the mental condition by legal standards. Such a mental result will amount to a conclusion of law and be subject to the administrative objections attaching to the reception of that form of reasoning. Thus, he will not be allowed to say that a person who purports to have executed a will was legally devoid of testamentary capacity by reason of mental imbecility or aberration." See also Morgan v. Bell, 189 Ga. 432, 437, 438
(5 S.E. 897), and cit.; Smoot v. Alexander, 188 Ga. 203
(3 S.E.2d 593). Accordingly, the judge did not err in refusing to allow an expert witness to answer the following question: "According to your knowledge of psychiatry, is an imbecile such as [the defendant] responsible?" Nor did the judge err in refusing to allow this witness to answer the question, "Is an idiot responsible?" although it appears that the expected answer to both questions was that "I do not think that [the defendant] is responsible." Moreover, as to the second question, it appears that the witness had in fact testified that the defendant was not an idiot.
12. Giving to the jury preliminary instructions as to insanity and weakmindedness while such testimony was being admitted and before the conclusion of the case, in order to guide the jury as to the purpose for which such evidence was admitted and could be considered, was not untimely or improper. See Pennington v.Perry, 156 Ga. 103 (4) (118 S.E. 710); Troutman v. U.S. 100 F.2d 628, and cit. The inclusion of delusional insanity in the definition of insanity and the test of criminal responsibility *Page 719 
can not be taken as prejudicial to the defendant, where the testimony as to insanity had not been completed and the judge could not determine its scope, and where he expressly cautioned the jury that they might consider the subject of delusional insanity, "if there should be any evidence of such insanity," and limited the preliminary instructions to the evidence "that has been or may be introduced," with the further caution that in stating the law "just given," or "previously given," "the court is not expressing any opinion as to what evidence, if any, has been or might be introduced by the defendant, and is not intended to have any effect, restriction, or limitations upon the defendant with reference to any evidence of any nature which he may consider relevant and material to his case and which he may offer during the progress of the trial." See Davis v. State,190 Ga. 100 (4, a) (8 S.E.2d 394). Nor were the preliminary instructions subject to the exception that they limited a consideration of evidence as to weakmindedness merely to the question whether the alleged confessions were made and were voluntary, without permitting the jury to consider the testimony on the general defense of insanity. The jury were told, in these instructions, that even though they found that the confessions had been made, "yet if the defendant shows to your reasonable satisfaction that at [such] time or times . . the defendant was an idiot, or a lunatic, or an insane person, then said confession or confessions would have no probative value or force whatever, and you should disregard it or them entirely in your consideration of the case." In the final charge the court said: "The instructions now being given you . . are intended to be complete and cover the whole case. These instructionssupersede any other instructions given to you during the progress of the case, to aid you, if they did, in distinguishing and applying the testimony, and not intended to be complete. . . You apply the law now being given you by the court to the facts of the case, as you find them to be, and make your findings as to the truth of the same." Not only in this charge, but in a recharge given by request of the jury, they were fully instructed as to the defense and law of insanity, and that, irrespective of the question as to confessions, they should "acquit the defendant" if they found him to be an "idiot or a lunatic or an insane person."
13. It is the general rule that where there has been an erroneous *Page 720 
instruction calculated to mislead the jury on a material issue, the error is not cured by merely afterwards giving a correct instruction. The basis of the rule is that "the jury can not be expected to select one part of a charge to the exclusion of another, nor to determine whether one part cures a previous error, without having their attention specially called thereto, and being instructed accordingly." Gill v. Willingham,156 Ga. 728 (4) (120 S.E. 108); Morris v. Warlick, 118 Ga. 421
(2) (45 S.E. 407). This rule has been applied in certain cases, not only where the correct charge was given after intervening instructions, but where it immediately followed the correct charge. Savannah, Fla. c. Ry. Co. v. Hatcher,118 Ga. 273 (45 S.E. 239); Caison v. State, 171 Ga. 1 (3), 7 (154 S.E. 337); Atlantic Coast Line R. Co. v. Canty, 12 Ga. App. 411
(2), 415 (77 S.E. 659). Error is assigned on the instruction: "The law does not attempt to measure the degree of insanity which renders a person irresponsible for his act. That is a question for the jury." Immediately preceding this charge, the test as to sanity by ability to distinguish between right and wrong was correctly given; and immediately following the language in question the judge, in defining the essential criminal intent, stated that the question was whether the defendant "was mentally incapable of distinguishing between right and wrong with reference" to the act. However, he still referred to the question as solely a "question of fact." Even if this last instruction could be taken as an entirely correct statement, yet under the unanimous and controlling decision in Geer v. State,184 Ga. 805 (4), where the correct and erroneous charges were in juxtaposition, and the erroneous language was almost identical with that in the present case, a new trial must be granted. In that case the charge was: "The law does not attempt to measure the degree of insanity which renders a man or woman legally irresponsible for his or her acts. That is a question of fact for the jury." The vice of the instruction, as held in the Geer andCaison decisions, is that "the law does fix the degree of insanity which renders a man legally irresponsible for his acts."
14. Evidence was offered by the defendant for the purpose of explaining his alleged flight from the city several months after the homicide, and his continued absence therefrom. A witness was asked the following question: "Tell the court what [the foster mother of the defendant] told you to say to [the former employer of *Page 721 
the defendant], and what [this employer] told you to say to [her]." The expected answer, as stated to the court, was: She "asked me to talk to [the former employer of the defendant] about the . . folks [at the plant where the defendant had worked] shooting at [the defendant], and causing . . the defendant to leave the city of Macon; and [she] asked me to ask [the former employer's] consent for . . the defendant to come back to Macon. I did comply with [her] request, and talked with [the employer]. [He] told me that he would not drop the charge against [the defendant], and I told [her] what [the employer] said. . . The mother of the defendant . . told me that [he] was away from Macon at the time, and that she wanted him to come home. [The employer] told me that [the defendant] had had some trouble with one of [the] employees at the [plant], a Mr. Garvin, and that [the employer] would not agree for [the defendant] to come back unless he went through with the case." The following additional question was asked of the same witness: "What did you tell [the foster mother of the defendant] after you had talked to [the former employer of the defendant]?" the expected answer to which, as the court was informed, was: "I told [her] that I had talked with [the employer], and that [he] would not agree for [the defendant] to come back to Macon unless he would go through with the case; that [the defendant] had had some trouble with [an] employee, Mr. Garvin." As recited in these grounds of the motion for new trial, "At the time of the adverse rulings herein complained of, movant's counsel stated to the court that he expected to connect up said evidence by showing that the above mentioned conversations between [the foster mother of the defendant] and [the witness] and then between [the witness] and [the former employer], and then between [the witness] and [the foster mother] were reported to . . the defendant, who because of said conversations remained away from the city of Macon until a later date." Under the Code, § 38-302, "When, in a legal investigation, information, conversation, letters and replies, and similar evidence are facts to explain conduct and ascertain motives, they shall be admitted in evidence, not as hearsay, but as original evidence." While it has been held that the application of this rule should be "carefully guarded" (Brown v. Matthews,79 Ga. 1 (4), 4 S.E. 13), the defendant in this case *Page 722 
was entitled to explain, if he could, the reason of his alleged flight and the reason of his continued absence from the city of the homicide; and it was error to exclude the testimony offered for this purpose.
Judgment reversed. All the Justicesconcur.